Andrew **LITTLE, Jr.**, and **Myrn Little**, Petitioners,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 17185.

United States Court of Appeals
Ninth Circuit.

July 7, 1961.

Bellwood & Goodman, Sherman J. Bellwood, Rupert, Idaho, for petitioner.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney and Carolyn R. Just, Attys., Dept. of Justice, Washington, D. C., for respondent.

Stephen H. Hart, Claude M. Maer, Jr., Denver, Colo., for Nat'l Livestock Tax Com., as amicus curiae.

Before BARNES, HAMLIN and MERRILL, Circuit Judges.

MERRILL, Circuit Judge.

This petition for review of a tax court decision presents a problem of concern to the livestock industry: the proper income tax treatment of the proceeds of sale of breeding stock raised by the taxpayers where the taxpayers are on the accrual system of accounting and following the "unit-livestock-price method" of livestock inventory valuation.

Taxpayers contend that they are entitled to change their breeding herd from an accrual to a cost system of accounting, which would place taxpayers in a more favorable position in reporting the proceeds of sale of breeding animals. Further, taxpayers contend, they should be permitted to make this change retroactively and recover the tax benefits of the change as though it had applied throughout the life of these animals.

The petition for review involves a deficiency in federal income tax for 1951 in the amount of $10,866.62. On petition of the taxpayers for redetermination the tax court upheld the commissioner. 34 T.C. 156. The court ruled that the taxpayers were not entitled to change their breeding herd to a cost accounting system from an accrual system; further, in any event, that such change could not be made retroactively. We have concluded that the tax court must be affirmed.

Upon this review, the National Livestock Tax Committee appears as amicus curiae in support of taxpayers' position.

Taxpayers were engaged in the livestock business in Idaho. Their business operations consisted principally of the raising and sale of sheep and cattle. In 1951 and 1952, their breeding herds consisted of approximately 15,000 head of

sheep and 150 head of cattle. Each year a certain number of ewes and buck lambs and heifer calves were selected in accordance with taxpayers' judgment to be raised as additions to the breeding herd. Also, each year, due to old age, disease or other circumstances, certain of the breeding animals were culled and sold. In 1951, taxpayers received for sale of breeding stock so culled the sum of $23,-060.09. It is income tax treatment of this item with which we are concerned.

Taxpayers have been on the accrual system of accounting and have followed the "unit-livestock-price method" of livestock inventory valuation as allowed by the commissioner in 1945. T.D. 5423, 1945, Cum.Bull. 70; Min. 5790, 1945, Cum.Bull. 72. This method is based wholly upon estimated costs and is allowed by the commissioner because of the difficulty of ascertaining the actual cost of raising livestock. Tr.Reg. 111, § 29.-22(c)–6, in this respect provides in part:

> "The 'unit-livestock-price method' provides for the valuation of the different classes of animals in the inventory at a standard unit price for each animal within a class. A livestock raiser electing this method of valuing his animals must adopt a reasonable classification of the animals in his inventory with respect to the age and kind included so that the unit prices assigned to the several classes will reasonably account for the normal costs incurred in producing the animals within such classes. Thus, if a cattle raiser determines that it costs approximately $15 to produce a calf, and $7.50 each year to raise the calf to maturity, his classifications and unit prices would be as follows: calves, $15; yearlings, $22.50; two-year old, $30.000; mature animals, $37.50. The classification selected by the livestock raiser, and the unit prices assigned to the several classes, are subject to approval by the Comissioner upon examination of the taxpayer's return."

The commissioner concedes that the breeding herd is entitled to capital gain treatment under § 117(j) of the Internal Revenue Code of 1939, 26 U.S.C. § 117 (1952 Ed.). The problem presented is as to the method of computing it.

The breeding stock sold in 1951 had been carried on inventory pursuant to the requirements of Treasury Regulation 111, § 29.22(c)–6, which provides:

> "A taxpayer who elects to use the 'unit-livestock-price method' must apply it to all livestock raised, whether for sale or for breeding, draft, or dairy purposes. Once established, the unit prices and classifications selected by the taxpayer must be consistently applied in all subsequent years in the valuation of livestock inventories. No changes in the classification of animals or unit prices will be made without the approval of the Commissioner."

The inventory value of these animals in 1951 was $7,280.62. This figure was treated by the commissioner as the cost basis of the animals from which the capital gain produced by their sale was computed.

The taxpayers challenge this method of computing capital gain. Their contention is that the breeding herd never should have been included in inventory and that the commissioner's regulation improperly required such inclusion. Their method of correcting this asserted error was to deduct the sum of $7,280.62 (representing costs which, taxpayers claim, would have been deducted had the breeding herd not been included in inventory) from closing inventory and to report the sold animals at zero basis for capital gain purposes. This method the commissioner disallowed.

In considering the propriety of the commissioner's ruling, we start with the proposition that irrespective of whether one is on a cost or an accrual method of accounting, costs attributable to items receiving capital gains treatment are customarily capitalized throughout their life and are reflected in the ultimate ad-

justed cost basis of the goods at the time of their sale or disposition.

Because of the difficulty of ascertaining the true cost of raising a breeding herd, the commissioner in his regulations has in effect provided that such costs need not be separately capitalized, but that the breeding herd is to be treated in the same manner as the income herd. The result, whether the taxpayer is on the cost or on the unit-livestock-price inventory method of accrual accounting, is a single unified accounting system applying both to the income herd and to the breeding herd and making for ease of accounting both to the taxpayer and to the commissioner.

To the cost method taxpayer this means that costs of raising the breeding herd are annually reported as a part of the over-all costs of operation. On sale of the breeding animals, they are given a zero basis. Reg. 111, § 29.22(a)–7. Thus the entire proceeds of sale are reportable as capital gain. This fact is noted by Mertens, Vol. 3B, Law of Federal Income Taxation, page 569, § 22.130, in the following language:

"A taxpayer who can qualify for capital gain treatment under Section 1231 obtains an advantage if he uses the cash basis of accounting rather than the accrual basis, for under the cash basis the costs of raising animals are currently deducted, leaving a reduced basis which on disposition of the animals results in greater capital gain than if the costs had been capitalized. Consequently, an ordinary deduction is obtained at the cost of a capital gain."

As to the unit-livestock-price inventory taxpayer, instead of capitalizing the true costs of the breeding animals, the approved estimate of costs is used and establishes the cost basis of the animals for purposes of capital gain determination.

Taxpayers complain that it is improper and prejudicial to require them to treat what are essentially capital goods as inventory goods. They assert that to do so presupposes that the sale proceeds are income and that that income is to be spread over the life of the breeding herd and taxed in that fashion.

We do not so view the situation. The inventory method serves two separate purposes: as to the income herd, it makes the accrual system of accounting available to the taxpayer with the benefit to him of spreading over the life of the animals the income ultimately derived from their sale; as to the breeding herd, it provides a simple means of capitalizing costs.

Taxpayers protest that to require costs to be capitalized in their case and not to require it in the case of a cost method taxpayer is discriminatory. They rely on Scofield v. Lewis, 5 Cir., 1958, 251 F.2d 128. We must respectfully disagree.

What the commissioner is seeking through his regulations is a single unified system of accounting for each taxpayer, whether he be under a cost or an accrual-inventory system. Each method has its advantages over the other. The taxpayer is given his choice. What the commissioner refuses to permit is a hybrid system incorporating elements of both methods by which the taxpayer takes to himself selected advantages of each.

The advantages to which these taxpayers claim a right are not theirs as a matter of right. They are conferred not by the code but by the commissioner's regulations. They are conferred for a purpose and the fact that the conferral is limited in accordance with such purpose does not render it arbitrary or discriminatory. The conferral must be so limited or the purpose is lost. It would appear to be an anomaly if the benefit bestowed by the commissioner upon the cost system taxpayer for the purpose of achieving a unified accounting system were thereby to become available to an accrual system taxpayer, with the result that a unified accounting system was lost.

■ We conclude that the tax court was not in error in its ruling upholding the requirement of Treasury Regulation 111, § 29.22(c)–6, that a taxpayer electing to use the unit-livestock-price method of inventory valuation must apply it to the breeding herd. We find, in this respect, that the recent decision in United State v. Ekberg, 8 Cir., 291 F.2d 913, provides support for our conclusion.

Our decision upon this issue makes it unnecessary for us to reach taxpayers' second contention: that they are retroactively entitled to the benefits which a change of the breeding herd to the cost system would provide.

A second problem presented by this case relates to the amount of the net operating loss deduction for the taxable year 1951.

Taxpayers had an allowable loss carryback from 1952 to 1951 (computed under § 122(c) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 122(c) [1]) in the sum of $11,962.92. In computing the net operating loss deduction the commissioner reduced this amount by $10,363.37, representing one-half of the taxpayers' 1951 long-term capital gains of $20,726.74. A net operating loss deduction in the sum of $1,599.55 was approved. Such reduction was pursuant to the provisions of § 122(d) (4).[2]

■ With reference to this section and its general purpose, the tax court in Kaecker v. Commissioner, 1958, 30 T.C. 897, 899, stated:

"That general purpose is to allow a taxpayer to set off against income for one year the net operating losses for later years. It is a tax relief measure but it is designed to prevent combining with it certain designated relief allowances previously taken by the taxpayer. It reintroduces that income which had escaped taxation by reason of section 117 (b). Having enjoyed the benefit of section 117(b) in their computation of net income in 1952, petitioners must now have their net operating loss carry-backs reduced by the amount of said benefit if they desire the benefit of section 122(c)."

■ Taxpayers assert that since they computed their 1951 tax under the alternative tax provisions of § 117(c) the exception specified in § 122(d) (4) should not apply. This proposition the tax court rejected upon the authority of Appleby v. United States, Court of Claims, 1953, 116 F.Supp. 418. We agree. The court of claims there stated at page 421:

"In both computations the capital loss is utilized to afford a tax benefit. * * * Having thus enjoyed the benefit in the initial computation, it must now be offset according to the statute before the allowable carry-back can properly become a net operating loss deduction for the taxable year 1941."

Affirmed.

---

1. "(c) Amount of net operating loss deduction.—The amount of the net operating loss deduction shall be the aggregate of the net operating loss carry-overs and of the net operating loss carry-backs to the taxable year reduced by the amount, if any, by which the net income (computed with the exceptions and limitations provided in subsection (d) (1), (2), (3), and (4)) exceeds, in the case of a taxpayer other than a corporation, the net income (computed without such deduction), or, in the case of a corporation, the normal-tax net income (computed without such deduction and without the credit provided in section 26(h) and (i))."

2. "(d) Exceptions, additions and limitations. The exceptions, additions, and limitations referred to in subsections (a), (b), and (c) shall be as follows:

* * * * *

"(4) Gains and losses from sales or exchanges of capital assets shall be taken into account without regard to the provisions of section 117(b). As so computed the amount deductible on account of such losses shall not exceed the amount includible on account of such gains."