Adolf J. Urbanovsky v. Commissioner.
Urbanovsky v. Commissioner
Docket No. 3555-62.
United States Tax Court
T.C. Memo 1965-276; 1965 Tax Ct. Memo LEXIS 53; 24 T.C.M. (CCH) 1518; T.C.M. (RIA) 65276; October 19, 1965
George T. Qualley, for the petitioner. Ronald M. Frykberg, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined the following deficiencies in the income taxes of petitioner: Taxable Year
Deficiency
1958
$1,262.75
1959
1,509.45
1960
872.01
By an amendment to his answer respondent claimed increased deficiencies as follows: Taxable Year
Deficiency
1958
$257.47
1959
362.59
1960
176.61
*54 A minor adjustment reflected in the stipulation of facts will be given effect in the Rule 50 computation. In addition, the petitioner's attorney has conceded that the Federal income tax returns for the years in issue were separate rather than joint. [1] Only two issues remain for decision: (1) Whether the petitioner must include in inventory the heifers raised by him for breeding purposes during 1958, 1959, and 1960, and (2) whether petitioner realized income in 1959 and 1960 from the sale of certain steers alleged to have been given by him to his children in prior years. Findings of Fact Some of the facts have been stipulated and are so found. Adolf J. Urbanovsky (hereafter called petitioner) is a married individual residing near Ord, Nebraska, with his wife, Virginia, and their children, Emily, Katherine, Dennis, and Michael. Petitioner filed his individual Federal income tax *55 returns for the years 1958, 1959, and 1960 with the district director of internal revenue, Omaha, Nebraska. Facts Relating to Issue 1 In 1946 petitioner entered the farming and ranching business, and in the years immediately preceding those in issue he was primarily engaged in buying and raising cattle for sale. Petitioner employed a hybrid method of accounting known as the "inventory method." During 1955 and 1956, petitioner listed all of the cattle he owned on inventory schedules in his Federal income tax returns and treated all sales thereof as ordinary income. But beginning with the ending inventory for the calendar year 1957 (and throughout the years in issue) petitioner included in inventory all his cattle except the heifers held for breeding purposes. The number of heifers raised each year, and held over for breeding purposes, is as follows: Year
Helfers
1957
64
1958
73
1959
83
1960
30
As a result of this change, petitioner reported $22,210 as his cattle inventory on December 31, 1957, in his income tax return for that year. In petitioner's books and records this cattle inventory is detailed as follows: Number
Value of
of Head
Head
Total
Cows
149
$ 90
$13,410
Bulls
2
150
300
Steer calves
74
110
8,140
Yearling heifers
6
60
360
$22,210
*56 The 64 heifers born in 1957 were not included in the ending inventory. In his 1958 and 1959 Federal income tax returns petitioner reported cattle inventories of $19,650 and $19,020, respectively. In both of these years petitioner valued his inventoried cattle at the same prices used in his 1957 return. This same valuation procedure was also applied to the year 1960, when the petitioner reported the cattle inventory as of December 31 at $9,900. In each of these years raised heifers were not included in the year-end inventory. In Schedule D of his 1957, 1958, 1959, and 1960 income tax returns petitioner reported various sales of raised cows, each with an inventory value of $90 a head. The gains from these sales were treated as capital gains by the petitioner in the following amounts: Total
Number
Sales
Year
Sold
Price
Inventory
Gain
1957
41
$4,382.20
$3,690.00
$ 692.20
1958
4
505.28
360.00
145.28
1959
19
3,165.40
1,710.00
1,455.40
1960
23
3,119.70
2,070.00
1,049.97
Petitioner also reported in Schedule D of his 1958 return the sale of 15 raised heifers born in 1957. Likewise, in Schedule D of his 1959 return, petitioner reported *57 a sale of 18 raised heifers born in 1958. Finally, in Schedule D for 1960, petitioner reported a sale of 31 raised heifers born in 1959. None of these heifers had been included in petitioner's cattle inventories. When sold, the heifers were removed from a capital account created by the petitioner in 1957. These heifers had been carried at a zero basis, and the gains from their sales were reported as capital gains by the petitioner. For tax purposes all of petitioner's ranch activities were treated as one operation. Facts Relating to Issue 2 In the spring of 1958 petitioner picked out two newly born calves for each of his four children. On March 19, 1959, a personal property tax schedule was filed in the names of Emily, Katherine, Dennis, and Michael Urbanovsky, all of whom were under 12 years of age. Listed on this schedule were eight calves with a reported actual value of $400 and an assessed valuation of $140. In the spring of 1959 petitioner picked out two additional calves for each of his children. On September 25, 1959, petitioner sold 58 steers for a price of $11,941.70. Included in this sale were the eight calves listed on the personal property tax schedule filed for *58 the Urbanovsky children on March 19, 1959. All of these steers had been raised together and cared for by the petitioner. The sales proceeds were deposited in petitioner's checking account. In December 1959, petitioner established 4 joint savings accounts at the Protective Savings and Loan Association in Ord, Nebraska. A deposit of $400 was made to each of these accounts and with respect to each account the petitioner and one of his children were listed as the owners thereof. Petitioner included $10,342 as gross receipts in his 1959 Federal income tax return with respect to the steers sold on September 25, and did not include the remaining $1,600. On November 13, 1959, petitioner paid the personal property taxes shown on the schedule filed for his children the previous spring. The tax bill was $4.98. The amount was paid from the petitioner's own checking account. On January 22, 1960, a personal property tax schedule signed by petitioner was filed in the names of the Urbanovsky children with the State of Nebraska. Listed on this schedule were eight calves with a reported actual value of $360. In May 1960, the petitioner transferred $300 of the funds in the savings accounts to his *59 checking account. On July 1, 1960, he transferred the balance of the funds in the savings accounts to his checking account. He expended these funds for farm and personal purposes. He established loan accounts in his books and records for the children in the amount of $400 each. Petitioner added to these sums an additional amount representing interest, and deducted from them certain items he bought during subsequent years, such as musical instruments and dental expenses. In September 1960, petitioner sold 52 head of cattle for $8,651.99 and deposited the full proceeds in his checking account. All of these steers had been raised together and cared for by petitioner. In his 1960 Federal income tax return petitioner did not include in gross income the sales price of eight head of steers at $140 each, or a total of $1,120. On November 18, 1960, petitioner paid the personal property taxes shown on the schedule filed for his children the previous January. Payment was made by a check drawn on his bank account. Ultimate Findings 1. Petitioner was required to include raised heifers, which were born in 1957, 1958, 1959, and 1960 and held for breeding purposes, in his closing livestock *60 inventories for the taxable years 1958, 1959, and 1960 in the total amounts of $6,225, $11,445, and $13,830, respectively. 2. Petitioner did not make valid and bona fide gifts of calves to his minor children in 1958 and 1959. 3. Petitioner realized additional income of $1,600 in 1959 and $1,120 in 1960 from the sale of steers. Opinion Issue 1 Petitioner seeks to place himself on the farm-price method of valuing inventory since under it he may choose whether or not to include in inventory his raised cattle held for breeding. [2] The farm-price method is defined as "market price less direct cost of disposition." Section 1.471-6(d), Income Tax Regs. Market price is the current price at the nearest market in quantities in which the farmer usually sells. E. T. Bamert, 8 B.T.A. 1099 (1927). Petitioner must show us that he valued his livestock at the market prices in effect on his inventory valuation dates in order to carry his burden of proof. He has not only failed to do so, but to the contrary has introduced evidence indicating that he was on the unit-livestock-price method. [3]
*61 The petitioner has introduced no evidence as to the market prices for cattle in his locale. His own testimony in this regard is vague and inconclusive. [4] Consequently, we cannot determine whether he used the farm-price method because we do not know what the market prices were. He has not met his burden of proof on this question by merely showing us that the valuations he used were above what they would have been under a unit-livestock-price method. To place himself on the farm-price method, the petitioner must comply with the Commissioner's regulations, which require him to value at "market price less cost of disposition." Even petitioner's books and records show that during the years here involved he valued his inventory by applying various unit values, unchanged from year to year, to the various classes of cattle in his herds. Bulls were valued from 1955 through 1960 at $150 a head, steer calves at $110, cows at $90, yearlings at $60, and calves at $45. In asserting that he adopted the farm-price method, petitioner is boldly asking us to believe that, year in and year out for almost 5 years, the prevailing market prices at the time of inventory valuation, less direct costs of *62 disposition for each class of animal, were consistently the same. While this is not an impossibility, it is so highly improbable that we find it unacceptable without the easily obtainable corroborative evidence petitioner could have introduced had he chosen to do so. In short, the evidence adduced is insufficient to support petitioner's contention that he was on the farm-price method of valuing his inventory. However, even if petitioner were able to prove that he valued the cattle held for breeding purposes on the farm-price method, the conclusion on these facts would be the same. Petitioner has not changed his cattle operations in any material way since 1957. The only distinctions that can be drawn between the pre and post 1957 years lie in the different accounting treatments used by petitioner in his income tax returns. The creation of a breeding herd is not a paper transaction, and alterations of books and records will not satisfy *63 the regulations. The facts contained in this record show that petitioner began his breeding operations before the year 1957 (the first year he excluded raised heifers from his inventory) and that he had already included such heifers in his inventories during at least the years 1955 and 1956. In Schedule D of his returns for 1957, 1958, 1959, and 1960, petitioner reported the sales of 41, 4, 19, and 23 head of raised cows, each of which had an inventory value of $90. It is apparent that they had previously been included in petitioner's livestock inventory since each cow sold had an inventory value of $90 and was classified as raised in the returns. These cows had been heifers used for breeding purposes because capital gain treatment is limited to sales of livestock held for draft, breeding, or dairy purposes, and the animals mentioned obviously did not come within the draft or dairy classifications. This prior inclusion of raised heifers in inventory constitutes the election of an accounting method, and their elimination from inventory in the years 1957 through 1960 was a change in that method that required the Commissioner's prior approval. Petitioner did not obtain this consent *64 and is in effect attempting a retroactive change. This, of course, he cannot do. Cf. Carter v. Commissioner, 257 F. 2d 595 (C.A. 5, 1958). Since we believe the petitioner freely selected and used the inventory method of accounting and the unit-livestock-price method of valuation, we hold that he was required to include raised heifers in his livestock inventories during the years in issue. The amounts for each year are set forth in our ultimate findings of fact. Issue 2 In Adolf Weil, 31 B.T.A. 899 (1934), affd. 82 F. 2d 561 (C.A. 5, 1936), certiorari denied 299 U.S. 552 (1936), we stated (p. 906): From an examination of the authorities we find the essential elements of a bona fide gift inter vivos to be (1) a donor competent to make the gift; (2) a donee capable of taking the gift; (3) a clear and unmistakable intention on the part of the donor to absolutely and irrevocably divest himself of the title, dominion, and control of the subject matter of the gift, in praesenti (4) the irrevocable transfer of the present legal title and of the dominion and control of the entire gift to the donee, so that the donor can exercise *65 no further act of dominion or control over it; (5) a delivery by the donor to the donee of the subject of the gift or of the most effectual means of commanding the dominion of it; (6) acceptance of the gift by the donee; Edson v. Lucas, 40 Fed. (2d) 398, and authorities there cited. Here the petitioner has shown his own competency to make a gift and his children's competency to receive them, thus satisfying the first two requirements. With respect to the third element, however, the evidence does not disclose that petitioner's clear and unmistakable intention was to divest himself absolutely and irrevocably of all title, dominion and control over the calves in question. Petitioner's intent must be to make a gift. The testimony [5] of Virginia Urbanovsky, the petitioner's wife, indicates that petitioner had reservations about the extent of his obligation to repay the loans. This conflicts with an intent on his part to completely divest himself of ownership. *66 As to the fourth element, petitioner's retention of control and dominion over the property for the purpose of selling it is inconsistent with a present absolute gift. The Court of Appeals, in affirming our opinion in Adolf Weil, 82 F. 2d at page 562, stated: We think the controlling fact is that Weil purposed all the time to sell the stock and kept control of it to do so. He was not the guardian of the children, and it is conceded that under the law of Alabama he could not sell the property of his minor children. It is plain that he intended to give his children the benefit of the stock, and perhaps went to great pains to make it appear that he had done so before the profit was realized which would be taxed in solido if his, but in separate parts and less severely if his children's; but all the time he intended to and did maintain dominion and control over the stock so as to sell it. Prior to the several sales, the certificates sold never passed out of his custody into the control of any other person; they were never indorsed to the children or put in their names, nor was any writing signed and delivered by him purporting to convey them. This retention of control for *67 the purpose of exercising dominion over them by sale is inconsistent with a present absolute gift, the legal result of which would have been to prevent a sale. The principles of the Weil decision are equally applicable in this case. At all times petitioner had dominion and control over the calves. They were in his custody and were raised and cared for by him along with his other calves. At all times he intended to sell the calves, and he was the only one who decided when they would be sold. All management decisions were made by him. Petitioner's intent may have been that his children should receive or partially benefit from the proceeds of sale, but, as was said in Weil, such an intent is insufficent to establish a gift of the property which produces the income. A bona fide gift also requires delivery of the subject of the gift or of the most effectual means of commanding the dominion over it. In this case written conveyances were not executed by the petitioner. The calves were not singled out or separated from the petitioner's other cattle. Physical possession of the calves remained with him at all times until their sale. Finally, for the reasons previously stated, we think *68 the final requirement, acceptance by the donee, is also lacking because no evidence has been presented to show that the petitioner's children at any time ever exercised any control over or ownership of the calves which might indicate their acceptance. Income is taxable to the one who earns it or creates the right to receive it. Lucas v. Earl, 281 U.S. 111 (1930). Transactions between members of a family which have the effect of reducing taxes are, of course, subject to close scrutiny. Finley v. Commissioner, 255 F. 2d 128 (C.A. 10, 1958). But this does not mean that a parent cannot make a gift of livestock to his children. Cf. Visintainer v. Commissioner, 187 F. 2d 519 (C.A. 10, 1951), certiorari denied 342 U.S. 858 (1951); and Alexander v. Commissioner, 190 F. 2d 753 (C.A. 5, 1951), which are clearly distinguishable on their facts from the instant case. In Visintainer, it was held that a father had made gifts of lambs to his children. In that case written conveyances were executed, the sheep were singled out and branded with the identifying brands of the children, the father filed Federal and State gift tax returns *69 and paid the gift taxes, separate Federal income tax returns were filed by the father and his children, ranch operation expenses were apportioned among the taxpayer and his children, the children's accounts were charged with their individual property tax and income tax, separate bills of sale were executed, financial statements furnished by the father to third persons did not include the sheep given to the children, and none of the money derived from the sale of the children's sheep was used for the support, maintenance, or education of the children, all outlays for those purposes being borne by the father. In Alexander, the cattle in question were branded with the son's separate brand. Separate books were kept for his business and the son's share of the feed expense was paid from the son's funds. The father paid the son's school and living expenses. The type of evidence necessary to sustain a gift is simply not present in the record before us. For example, written conveyances were not executed here. There is no evidence that expenses incurred in connection with producing the calves in question were apportioned or charged to the children, or that separate accounts were kept. There *70 is no evidence that gift tax returns were filed. The money derived from the sale of the steers was deposited in petitioner's checking account and expended by petitioner as he determined. The record does indicate that petitioner set up accounts in the names of his children in his books and records and reduced their account balances at least in part by amounts expended for the children's care and maintenance. In our opinion the evidence offered by petitioner in support of his position lacks substance and is vague and unconvincing. The 58 steers sold September 25, 1959, which petitioner contends included 8 head owned by his children, were not separated or specifically identified prior to or at the time of sale. They were sold together. The average sales price per head was nearly $206. Two or three months after the sale the petitioner caused four $400 savings accounts to be established by checks written on his checking account. The deposited amounts did not equal in total amount the proceeds of 8 steers sold at an average price of nearly $206 each. Not more than seven months after the savings accounts were opened they were completely depleted by the petitioner's withdrawals. The 52 *71 steers sold in September 1960, which petitioner contends included 8 head owned by his children, were not separated or specifically identified prior to or at the time of sale. They were sold together. The proceeds from the sale were deposited in petitioner's checking account and later spent as he determined. The fact that personal property tax schedules were filed in 1959 and 1960 in the names of petitioner's children is entitled to little weight. The taxes paid in 1959 and 1960 were paid by the petitioner from his checking account. Had there in fact been bona fide gifts of the calves, items of cost attributable to them would not be deductible by the petitioner as ordinary and necessary expenses. Petitioner did not offer any records showing allocation of costs and expenses incurred in connection with producing the steers between him and his children. In fact, the evidence indicates that the expenses and costs attributable to the steers were not charged to the children but rather incurred and paid by the petitioner. Accordingly, in sustaining respondent's determination on this issue, we hold that the purported transfers by petitioner to his children were not valid and bona fide *72 gifts and that the petitioner realized additional income from the sale of such steers, as set forth in our ultimate findings of fact. The increased deficiencies claimed by respondent in his amendment to answer have been conceded by petitioner and are therefore due. Decision will be entered under Rule 50. Footnotes
1. On page 14 of his brief petitioner recognizes that the limitations provided in section 6013(b)(2), Internal Revenue Code of 1954, preclude his making an election to file a joint return after filling a separate return. See Arthur Grossman 26 T.C. 234↩ (1956).
2. Petitioner has attempted to establish that he used the farm-price method rather than the unit-livestock-price method since the regulations require cattlemen using the latter method to include in inventory raised cattle held for breeding purposes. Sec. 1.471-6(f), Income Tax Regs. The validity of these regulations has been upheld twice. United States v. Ekberg, 291 F. 2d 913 (C.A. 8, 1961), and Little v. Commissioner, 294 F. 2d 661 (C.A. 9, 1961), but see contra Scofield v. Lewis, 251 F. 2d 128 (C.A. 5, 1958) and United States v. Catto, 344 F. 2d 227↩ (C.A. 5, 1965).
3. Sec. 1.471-6(e), Income Tax Regs., provides, in part, as follows: The "unit-livestock-price method" provides for the valuation of the different classes of animals in the inventory at a standard unit price for each animal within a class. A livestock raiser electing this method of valuing his animals must adopt a reasonable classification of the animals in his inventory with respect to the age and kind included so that the unit prices assigned to the several classes will reasonably account for the normal costs incurred in producing the animals within such classes.↩
4. Q. Who determined the market price? A. I did. Q. And how did you go about determining the market price? A. I determined the market price by the values that existed at the time that I made the - Q. (Interrupting) Valuation? A. Valuation.↩
5. Were you aware of and did you participate in the gifts of the children in 1958? A. Yes, we do everything together, consult one another. * * *
Q. Do you and your husband look upon the loan moneys received as an obligation to those children? A. No, we don't feel it's an obligation. Q. Do you feel you owe them this money? A. Yes, we do. Q. What do you mean, you don't feel it's an obligation? A. Well, we owe it to them but we don't feel it's something that, well, we have to. We're going to pay it and we feel that we should pay it, but we don't think that… Q. They would sue you? A. Yes, that's its hardship.↩