UNITED STATES *v.* CATTO ᴇᴛ ᴀʟ.

No. 535. Argued March 22–23, 1966.—Decided April 26, 1966.

*Jack S. Levin* argued the cause for the United States. With him on the briefs were *Solicitor General Marshall, Acting Assistant Attorneys General Featherston* and *Roberts,* and *Melva M. Graney.*

*Gordon G. Hawn* argued the cause for respondents Catto et al. With him on the brief was *Ben F. Foster. Claiborne B. Gregory* argued the cause for respondents Wardlaw et al. With him on the brief was *Elwood Cluck.*

MR. JUSTICE STEWART delivered the opinion of the Court.

The question presented in this case is whether taxpayers engaged in the livestock business who use an accrual method of accounting for animals raised for sale may employ a cash method of accounting for animals raised for breeding purposes, in order to take advantage of a federal income tax benefit available to cash-method taxpayers when breeding animals are sold.

The respondents are ranchers engaged in the business of raising livestock for sale. As an important element of their business, the respondents maintain herds of livestock used for breeding purposes. During the taxable years in question, the respondents sold animals from their breeding herds and reported the gains from the sales in accord with the accrual method of accounting they had elected for their overall ranching operations. Subsequently, they filed claims with the Commissioner of Internal Revenue for partial tax refunds, on the ground that they were entitled to use the more advantageous cash method of accounting in calculating the gain from sales of their breeding livestock. The Commissioner re-

jected the claims, and the respondents brought suit to obtain the refunds. Their claims were sustained by the District Court,[1] and the judgments were affirmed by the Court of Appeals for the Fifth Circuit.[2] We granted certiorari to resolve a conflict among the Circuits.[3] We now reverse the judgments of the Court of Appeals.

Section 1231 of the Internal Revenue Code of 1954, 26 U. S. C. § 1231 (1964 ed.), provides that in certain circumstances gains from the sale of property used by a taxpayer in his trade or business may be treated for federal income tax purposes as long-term capital gains. Section 1231 (b)(3) makes the section specifically applicable to sales of livestock held for breeding purposes.[4] No chal-

---

[1] *Wardlaw* v. *United States,* 223 F. Supp. 631 (D. C. W. D. Tex.); *Catto* v. *United States,* 223 F. Supp. 663 (D. C. W. D. Tex.).

[2] *United States* v. *Wardlaw,* 344 F. 2d 225; *United States* v. *Catto,* 344 F. 2d 227.

[3] The Court of Appeals affirmed the judgments of the District Court on the authority of its prior decision in *Scofield* v. *Lewis,* 251 F. 2d 128. But see *Carter* v. *Commissioner,* 257 F. 2d 595, 600–601 (C. A. 5th Cir.). The Eighth and Ninth Circuits have taken a contrary position and have refused to permit taxpayers using an accrual method of accounting for their overall ranching operation to employ a cash method of accounting for breeding livestock. *United States* v. *Ekberg,* 291 F. 2d 913 (C. A. 8th Cir.); *Little* v. *Commissioner,* 294 F. 2d 661 (C. A. 9th Cir.).

[4] Section 1231 of the Internal Revenue Code of 1954, 26 U. S. C. § 1231, provides in relevant part:

"§ 1231. *Property used in the trade or business and involuntary conversions.*

"(a) *General rule.*

"If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions,

lenge is raised here to the classification of the animals sold by the respondents as livestock held for breeding purposes within the meaning of that provision. Our sole concern is with the measure of the respondents' capital gain.

Each of the respondents elected the "unit-livestock-price" variant of the accrual method of accounting for his overall ranching operation.[5] Under that method, the

---

such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. . . .

"(b) *Definition of property used in the trade or business.*

"For purposes of this section—

. . . . .

"(3) *Livestock.*

"Such term also includes livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes, and held by him for 12 months or more from the date of acquisition. Such term does not include poultry."

[5] The unit-livestock-price method is described in Treas. Reg. (hereafter Reg.) § 1.471–6, which provides in relevant part:

"§ 1.471–6. *Inventories of livestock raisers and other farmers.*

. . . . .

"(c) Because of the difficulty of ascertaining actual cost of livestock and other farm products . . . farmers raising livestock may value their inventories of animals according to . . . the 'unit-livestock-price method.'

. . . . .

"(e) The 'unit-livestock-price method' provides for the valuation of the different classes of animals in the inventory at a standard unit price for each animal within a class. A livestock raiser electing this method of valuing his animals must adopt a reasonable classification of the animals in his inventory with respect to the age and kind included so that the unit prices assigned to the several classes will reasonably account for the normal costs incurred in producing the animals within such classes. Thus, if a cattle raiser determines that it costs approximately $15 to produce a calf, and $7.50 each year to raise the calf to maturity, his classifications and

respondents classified their livestock inventory by age and kind and assigned a standard unit price to the animals in each class. Both breeding animals and animals raised for sale were lumped together in the respondents' inventories, and the same unit prices were employed for both types of livestock. By multiplying the number of animals in each class by the unit price for the class, the opening and closing inventory valuations were readily calculated for each taxable year.

The applicable Treasury Regulations grant a current deduction for the expenses incurred in raising livestock, without regard either for the purpose for which the animals are raised or for the method of accounting employed by the taxpayer.[6] For ranchers who have elected the cash method of accounting, the current deduction is of course taken against ordinary income in the year the expense is paid. Since, as a result, the adjusted basis of the breeding animals at the time of sale is zero, the entire proceeds of the sales are reported as capital gains.

---

unit prices would be as follows: Calves, $15; yearlings, $22.50; 2-year olds, $30; mature animals, $37.50. . . .

"(f) A taxpayer who elects to use the 'unit-livestock-price method' must apply it to all livestock raised, whether for sale or for draft, breeding, or dairy purposes. Once established, the unit prices and classifications selected by the taxpayer must be consistently applied in all subsequent taxable years in the valuation of livestock inventories. No changes in the classification of animals or unit prices will be made without the approval of the Commissioner."

The values suggested in Reg. § 1.471–6 (e) have remained unchanged since they were first introduced into the Regulations in 1944. T. D. 5423, 1945 Cum. Bull. 70. Appropriate classifications and unit prices currently recognized by the Internal Revenue Service are: Calves, $40; yearlings, $55; 2-year olds, $70; mature animals, $85. See Farmer's Tax Guide, Internal Revenue Service Publication No. 225, p. 33 (1966 ed.).

[6] Reg. § 1.162–12: ". . . The purchase of feed and other costs connected with raising livestock may be treated as expense deductions insofar as such costs represent actual outlay . . . ."

Because of the mechanics of the accrual method of accounting used by the respondents, however, their current deductions for the expenses of raising their livestock were offset by the annual increments in the unit inventory values of the animals not sold during the taxable year.[7] The adjusted basis of the animals sold was therefore equal to the accumulated increments in their unit values, and only the proceeds of sale in excess of that basis were reported by the respondents as capital gain.[8] Although the respondents' capital gain was lower than the gain they would have reported had they used the cash method of accounting, the reduction was achieved at the cost of annulling the current deduction from ordinary income of the expenses of raising their breeding livestock. As a result, the respondents' overall tax on their gains from the sale of breeding livestock was larger than it would have been had they used the cash method of accounting with respect to those animals.[9] The Court of

---

[7] Under Reg. § 1.61–4 (b), the gross income of accrual-method ranchers is measured by the sum of sales income during the taxable year and closing inventory, less the sum of expenses incurred in raising the animals during the year and opening inventory. See also Reg. § 1.162–12. The mechanics of that computation accomplish the bookkeeping operation of subtracting the cost of goods sold from sales income. The effect of the use by the respondents of their inventory method of accounting is simultaneously to add to ordinary income the annual increments in the unit values of their unsold breeding livestock and to subtract the annual costs of raising the animals.

[8] Under the theory of the unit-livestock-price method, the accumulated increments in the unit values of the livestock should equal the total expenses incurred in raising the animals. In effect, therefore, the expenses incurred by the respondents in raising their breeding livestock were deferred until the year of sale.

[9] In other words, under both the cash and accrual methods of accounting, the expenses incurred in raising breeding livestock are currently deductible, and the proceeds of sale in excess of those expenses are taxed as capital gains. The essence of the difference between the two accounting methods in the circumstances of this case lies in the tax treatment of the portion of the sales proceeds

108

Appeals held in the present case that the respondents were not required to use the accrual method of accounting for their breeding livestock, and that they were therefore entitled to report the gains from the sales of those animals in accordance with the more advantageous cash method.[10]  We think the Court of Appeals was in error.

The respondents' principal contention is that breeding livestock are simply not the type of asset that is prop-

---

that represents the recovery of the expenses incurred in raising the animals. That portion of the proceeds is taxed to cash-method ranchers at rates applicable to capital gains, whereas it is taxed to accrual-method ranchers at rates applicable to ordinary income. Thus, with respect to sales of breeding livestock, the cash method of accounting offers ranchers a route by which ordinary income can be transmuted into capital gain.  See Mertens, Law of Federal Income Taxation § 22.130, p. 569; Jamison, Tax Planning with Livestock and Farming Operations, 1961 So. Calif. Tax Inst. 583, 599–607.

To the extent, of course, that the expenses actually incurred in raising their breeding livestock exceed the estimated unit valuations, accrual-method ranchers are themselves able to transmute ordinary income into capital gain.  It is therefore to the advantage of accrual-method ranchers to place low unit valuations on their breeding livestock.

[10] The respondents proposed to accomplish their shift in accounting procedure in two steps: First, by deducting from ordinary income the adjusted basis of the breeding livestock actually sold during the taxable years and to treat the entire proceeds of the sales as capital gain in the year of sale; second, by eliminating from their inventories all remaining livestock held for breeding purposes and achieving a zero basis for those animals by deducting from ordinary income their existing unit valuations, which represent the accumulated costs of raising the animals.  Even though the Court of Appeals sustained the claims of the respondents, the court noted that the correction would result in an inordinate deduction against ordinary income in the year the adjustment was made, since expenses properly allocable to prior years would be bunched in the year of the correction.  344 F. 2d 227, 229.  In the District Court, some of the respondents had suggested that, in the alternative, the inventory correction for breeding livestock not yet sold might be accomplished by allowing reduction of the accrued unit values to a zero basis over a five-year period.

erly includible in inventory. Just as manufacturers do not put capital equipment in inventory, so, respondents claim, they need not place their breeding livestock in inventory. Therefore, they say, the method of deferral of expenses worked for inventory-type assets by the mechanics of accrual accounting under Treas. Reg. (hereafter Reg.) § 1.61–4 (b)[11] is completely inapplicable to such livestock, because the animals should never have been placed in inventory in the first place. The result of freeing breeding livestock from the accounting procedure of Reg. § 1.61–4 (b) would be to enable the respondents to obtain the benefits of the cash method, since the current deduction under Reg. § 1.162–12 would no longer be offset by the annual increments in the unit values of their breeding livestock.

Although the contention of the respondents is not without force, we believe that the evolution of the statute and regulations here in question demonstrates that the expenses of raising breeding livestock were intended to be deferred by accrual-method taxpayers. That interpretation of the legislative and administrative history is fully consonant with accounting logic, and we therefore conclude that the Commissioner should prevail.

The general and long-standing rule for all taxpayers, whether they use the cash or accrual method of accounting, is that costs incurred in the acquisition, production, or development of capital assets, inventory, and other property used in the trade or business may not be currently deducted, but must be deferred until the year of sale, when the accumulated costs may be set off against the proceeds of the sale.[12] Under general principles of

---

[11] See notes 7 and 8, *supra*.

[12] Internal Revenue Code of 1954, §§ 263, 471, 1011–1013, 1016 (a)(1); Reg. §§ 1.263 (a)–2 (a), 1.471–1, 1.1016–2. Cf. I. T. 1309, I–1 Cum. Bull. 196 (1922). See *Doyle* v. *Mitchell Brothers Co.,* 247 U. S. 179, 183–187; *Spring City Co.* v. *Commissioner,* 292 U. S. 182, 185; *Snyder* v. *Commissioner,* 295 U. S. 134, 141, n. 4. Cf. Moen,

accounting, therefore, it would be expected that expenses incurred by ranchers in raising breeding livestock should be charged to capital account, even though the ranchers employed the cash method of accounting.

As early as 1919, however, in response to the specific need for a relatively more simplified method of farm accounting than was available even under the cash method as it then existed, the Secretary of the Treasury and the Commissioner of Internal Revenue promulgated Regulations expanding the cash method to authorize a current deduction for expenses incurred by farmers and ranchers in raising crops and animals.[13] Although the question does not appear to have arisen, it is hardly likely that the Commissioner would have permitted accrual-method ranchers, for whom the new procedure was not designed, selectively to apply the simplified cash method to their breeding livestock or any other part of their herds. At the time these Regulations were issued, and for more than two decades thereafter, gains from the

---

Special Capital Gains Treatment for Farmers, 17 Ohio St. L. J. 32–41 (1956). Thus, a cash-method rancher who purchases an animal for breeding purposes must capitalize the cost of the purchase. I. T. 3666, 1944 Cum. Bull. 270; Reg. § 1.162–12.

[13] Reg. 45, Art. 110 (April 17, 1919 ed.) (Revenue Act of 1918) provided in part: ". . . The cost of feeding and raising live stock may be treated as an expense deduction . . . ." See Reg. § 1.162–12, note 6, *supra*. Cf. Reg. 33 (Revised), ¶¶ 30, 404–405 (Revenue Act of 1916, as amended by Revenue Act of 1917). At the time the Regulations under the Revenue Act of 1918 were promulgated, it appears that the Bureau of Internal Revenue did not recognize specialized techniques of accrual accounting for approximating and deferring the costs of raising an animal to maturity. See Special Letter from the Secretary of the Treasury to the Chairman of the Senate Finance Committee, June 27, 1952, 98 Cong. Rec. 8307, 1952 CCH Fed. Tax Rep. ¶ 6239. At least by 1922, however, the accrual method of accounting had been explicitly adapted to the complexity of farm operations. Reg. 62, Arts. 38, 1586 (2) (1922 ed.) (Revenue Act of 1921). See also note 21, *infra*.

sale of breeding livestock were taxed as ordinary in-come.[14]   Thus, the choice of accounting method affected only the timing of the deduction for the expenses of raising the animals, and no serious distortion of taxable income was introduced when ranchers elected the cash method for their breeding livestock.[15]   Throughout this period, no distinction appears to have been drawn be-tween breeding and other livestock in the inventories maintained by ranchers using the more sophisticated accrual method of accounting.   Indeed, since 1922, the Treasury Regulations have specifically contemplated that all livestock, whether raised for breeding or other purposes, were to be included in the inventory of accrual-method ranchers.[16]

In 1942, however, Congress added § 117 (j) to the Internal Revenue Code of 1939.[17]   That section, the

---

[14] Favorable tax treatment for capital gains was introduced into the income tax law in the Revenue Act of 1921, but gains from the sale of breeding livestock continued to be treated as ordinary income. Cf. Wells, Legislative History of Treatment of Capital Gains under the Federal Income Tax, 1913–1948, 2 Nat. Tax. J. 12 (1949).

[15] The principal utility of the simplified cash method was that it enabled farmers and ranchers to escape the complexity of estab-lishing and deferring the precise costs of raising their breeding ani-mals.   Compare Reg. § 1.471–6 (c), supra, note 5.   In addition, ranchers using the cash method possessed substantial flexibility in determining the year in which income was realized.   The defects of the method were that it produced a bunching of income in the year of sale and an inaccurate matching of income from the sale of the livestock with the expenses incurred in raising the animals.   The accrual method, on the other hand, involved neither bunching of income nor inaccurate matching of income with expenses.   More-over, under the unit-livestock-price variant of the accrual method of accounting chosen by the respondents, the incremental amounts taken into inventory each year as the livestock increased in value were available as a source of income against which the expenses incurred in raising the animals could be deducted.

[16] Reg. 62, Art. 1586 (1) (1922 ed.) (Revenue Act of 1921).

[17] Revenue Act of 1942, c. 619, 56 Stat. 846, § 151 (b).

progenitor of § 1231 of the 1954 Code, established capital gain treatment for the sale of "property used in the trade or business" of the taxpayer. The general language of the 1942 amendment left the tax status of breeding livestock in doubt, and the ensuing nine years found the Commissioner and ranchers jockeying for position on the treatment of gains from the sale of such animals.[18] Congress resolved the controversy in 1951 by amending § 117 (j) to make clear that capital gain treatment was to be accorded to gains from the sale of livestock raised for breeding purposes.[19] Predictably, the amendment encouraged attempts by accrual-method ranchers to transfer to the cash method of accounting. The Commissioner, however, refused to permit the changes where

---

[18] See I. T. 3666, 1944 Cum. Bull. 270; I. T. 3712, 1945 Cum. Bull. 176; Special Ruling by Commissioner of Internal Revenue, Aug. 4, 1947 (1948 CCH Fed. Tax Rep. ¶ 6091) (capital gain treatment available to cash-method ranchers only for extraordinary sales of breeding livestock, such as in reduction of herd size, not for animals culled from the breeding herd in the normal course of business because of age or disease); *Albright* v. *United States,* 173 F. 2d 339 (C. A. 8th Cir.) (capital gain treatment available to cash-basis ranchers, even for routine sales of breeding livestock); *Fawn Lake Ranch Co.* v. *Commissioner,* 12 T. C. 1139, appeal dismissed, 180 F. 2d 749 (C. A. 8th Cir.) (capital gain treatment available to accrual-method ranchers for sales of breeding livestock, even though the animals had been included in inventory); *United States* v. *Bennett,* 186 F. 2d 407 (C. A. 5th Cir.) (breeding livestock not held primarily for sale); Mim. 6660, 1951–2 Cum. Bull. 60 (capital gain treatment not available for breeding livestock unless animals used as breeders for substantially their full breeding lives).

[19] Revenue Act of 1951, c. 521, 65 Stat. 452, 501, § 324. The amendment, which was carried forward without change as § 1231 (b)(3) of the 1954 Code, extended from six to 12 months the holding period required before sale of the livestock could qualify as a capital gain. A lingering effort by the Commissioner to impose certain additional criteria concerning age and reproductive capacity and use of breeding livestock was rejected by the Court of Appeals for the Second Circuit. *McDonald* v. *Commissioner,* 214 F. 2d 341.

it appeared that the sole motivation for the shift was to reap the capital gain windfall available to cash-method ranchers.[20]

The issue raised by the respondents ultimately centers on the validity of Reg. § 1.471–6 (f), which requires that a "taxpayer who elects to use the 'unit-livestock-price method' must apply it to all livestock raised, whether for sale or for . . . breeding . . . purposes." That provision is neither arbitrary nor inconsistent with the revenue statute or with other regulations under the statute. The unit-livestock-price method is soundly grounded in accepted principles of accounting. It has been specifically recognized by the tax laws as a valid approach to livestock accounting for more than 20 years.[21] Moreover, as the practice of the respondents indicates, the expenses incurred in the production and development of their livestock were essentially the same, whether the animals were raised for sale or for breeding purposes, and the unit-livestock-price method of accounting provided convenient and efficient annual estimates of those expenses. There can thus be no question that the

---

[20] Because we hold here that the Commissioner could validly refuse to acquiesce in the respondents' proposed change in their accounting method, we have no occasion to consider the effect either of the respondents' failure to request his permission or of their attempt to initiate the change after their returns for the taxable years had been filed. See Reg. § 1.471–6 (a). Compare Bureau of Internal Revenue Release, 1953 CCH Fed. Tax Rep. ¶ 6191 (May 12, 1953), announcing that the Bureau at that time would no longer withhold action on requests by livestock raisers to change their methods of accounting.

[21] The unit-livestock-price method was not formally recognized in the Treasury Regulations until 1944. T. D. 5423, 1945 Cum. Bull. 70, amending Reg. 111, § 29.22 (c)–6 under the 1939 Code. It appears, however, that comparable methods of estimating livestock values had long been informally available to ranchers. See Mim. 5790, 1945 Cum. Bull. 72.

respondents' accounting method accurately reflected their income.

Were we concerned, therefore, solely with the applicability to breeding livestock of the unit-livestock-price method of accounting, we would be unable to characterize as arbitrary the Commissioner's refusal to permit the change the respondents seek. Congress has granted the Commissioner broad discretion in shepherding the accounting methods used by taxpayers,[22] and the uniform application of the unit-livestock-price method to the respondents' entire livestock operation is a reasonable exercise of the discretion rested by Congress in the Secretary and the Commissioner for the administration of the tax laws. "It is not the province of the court to weigh and determine the relative merits of systems of accounting." *Brown* v. *Helvering,* 291 U. S. 193, 204–205; *Lucas* v. *American Code Co.,* 280 U. S. 445, 449; *Automobile Club of Michigan* v. *Commissioner,* 353 U. S. 180, 189–190; *Commissioner* v. *Hansen,* 360 U. S. 446, 467; *Schlude* v. *Commissioner,* 372 U. S. 128, 133–135.

The issue in the present case, however, is complicated by the substantial tax differential worked by the Treas-

---

[22] Internal Revenue Code of 1954, §§ 7805; 446 (a)–(c), (e); 471; Reg. §§ 1.446–1 (e)(2), 1.471–6 (f). Reg. § 1.471–6 (f) requires only that ranchers who use the unit-livestock-price method for livestock raised for sale must also apply the method to livestock raised for breeding purposes. By that procedure, a unitary accounting system is established for all livestock raised by the ranchers. The Commissioner does not contend that livestock raised for breeding purposes and livestock raised for sale must be maintained in the same inventory, and no question is raised here concerning the availability to ranchers of a depreciation deduction on the unit value of livestock that have been raised to maturity for breeding purposes. Cf. Reg. §§ 1.61–4 (b), 1.167 (a)–6 (b). Compare I. T. 3712, 1945 Cum. Bull. 176; Mim. 5790, 1945 Cum. Bull. 72. Also, no question is raised here concerning the status of livestock that a rancher has purchased, rather than raised, for breeding purposes. See Reg. § 1.471–6 (g).

ury Regulations in favor of cash-method ranchers and against accrual-method ranchers when breeding livestock are sold. It is the position of the Commissioner that the Treasury Department is unable by administrative action to require cash-method ranchers to capitalize the expenses incurred in raising their breeding livestock.[23] The respondents contend that so long as the present dichotomy is maintained, they are entitled to participate in the benefits available under the cash method.

We need not determine whether in all cases the Commissioner may legitimately refuse to acquiesce in the transition by ranchers from the accrual method to the cash method of accounting. The Commissioner is not, of course, obliged to permit taxpayers to shift their accounting methods to accommodate every fluctuation in the revenue laws. *Helvering* v. *Wilshire Oil Co.,* 308 U. S. 90, 97; *Commissioner* v. *South Texas Lumber Co.,* 333 U. S. 496. We may assume *arguendo* that particular legislative or administrative mutations in the tax laws

---

[23] The Secretary has stated that the Treasury Department is foreclosed by the legislative history of the 1951 amendment from eliminating by Regulation the capital gain windfall available to cash-method ranchers. Special Letter from the Secretary of the Treasury to the Chairman of the Senate Finance Committee, *supra,* note 13. Both of the Committee Reports on the Revenue Act of 1951 stated that "gains from sales of livestock should be computed in accordance with the method of livestock accounting used by the taxpayer and *presently* recognized by the Bureau of Internal Revenue." S. Rep. No. 781, 82d Cong., 1st Sess., p. 42, 1951–2 Cum. Bull. 458, 488; H. R. Rep. No. 586, 82d Cong., 1st Sess., p. 32, 1951–2 Cum. Bull. 357, 380. (Emphasis added.) We need not here determine the correctness of the Secretary's interpretation of the legislative history, since no question is presented in this case concerning the vulnerability of the position of cash-method ranchers to action by the Secretary. Similarly, because of the grounds on which we rest our decision, we do not pass upon the Commissioner's contention that the legislative history established a mandate by Congress in favor of his position in the present case.

may foster inequities so great between taxpayers similarly situated that the Commissioner could not legitimately reject a proposed change in accounting method unless the taxpayer had exercised a meaningful choice at the time he selected his contemporary method. No such substantial inequity is presented here. The respondents have not sought to embrace the cash method of accounting for their entire ranching operation. To the contrary, they ask that they be permitted to subject only their breeding livestock to that method. Thus, they propose to retain the advantages of the accrual method for their livestock raised for sale.

It is clear that application of the cash method of accounting to sales of breeding livestock would substantially distort the economic picture of the respondents' ranching operations.[24] The sacrifice in accounting accuracy under the cash method represents an historical concession by the Secretary and the Commissioner to provide a unitary and expedient bookkeeping system for farmers and ranchers in need of a simplified accounting procedure. A concomitant of the special dispensation that has been made available to cash-method ranchers is the favorable capital gain treatment that results whenever breeding livestock are sold. The respondents, however, have demonstrated their intent to retain the accuracies of the unit-livestock-price method of accounting for animals they have raised for sale. That method was itself introduced as a special concession to accrual-method ranchers, who were thereby enabled to avoid the difficulties of establishing the actual costs of raising their livestock. The respondents' desire to shift from the unit-livestock-price accrual method to the cash method for their breeding livestock is therefore divorced from the sole rationale for which each of those account-

---

[24] See note 15, *supra*.

ing methods was made available. By selectively combining attributes of both methods, the respondents seek to fashion a hybrid system that would defeat the Commissioner's goal of providing a unitary accounting method for all taxpayers. It clearly lay within the discretion of the Commissioner to reject such a hybrid system of accounting, and the Court of Appeals was in error in accepting the respondents' claims. See *Niles Bement Pond Co.* v. *United States,* 281 U. S. 357, 360; *Commissioner* v. *South Texas Lumber Co.,* 333 U. S. 496, 503–504; *Commissioner* v. *Hansen,* 360 U. S. 446, 467; *Little* v. *Commissioner,* 294 F. 2d 661, 664 (C. A. 9th Cir.); *Carter* v. *Commissioner,* 257 F. 2d 595, 600 (C. A. 5th Cir.); *SoRelle* v. *Commissioner,* 22 T. C. 459, 468–469.

The judgments are therefore reversed and the case is remanded to the Court of Appeals for the Fifth Circuit for further proceedings consistent with this opinion.

*It is so ordered.*