Kittitas Ranch, Inc. v. Commissioner.
Kittitas Ranch, Inc. v. Commissioner
Docket No. 4439-65.
United States Tax Court
T.C. Memo 1967-141; 1967 Tax Ct. Memo LEXIS 121; 26 T.C.M. (CCH) 640; T.C.M. (RIA) 67141; June 27, 1967
*121 Adam Y. Bennion, 523 W. Sixth St., Los Angeles, Calif., for the petitioner. Morley H. White, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioner's income tax for the calendar years 1961 and 1962 in the amounts of $1,514 and $2,323, respectively. The issue for decision is whether the sheep in petitioner's breeding herd had a basis in excess of zero at the time petitioner disposed of them. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner, a corporation organized on February 11, 1959, under the laws of the State of Washington, had its principal office at Huntington Park, California, at the time of the filing of the petition in this case. Petitioner filed its Federal income tax returns for the calendar years 1961 and 1962 with the district director of internal revenue at Los Angeles, California. Petitioner was organized in a tax-free exchange under section 351 of the Internal Revenue Code of 1954 in which all of its stock, except for qualifying shares, was issued to Leroy Sanders, Sr. (hereinafter referred to as Sanders) in exchange for the assets used in the operation *122 of a sheep ranch. After its organization and throughout the years here in issue, petitioner was engaged in the business of breeding and selling sheep in the State of Washington. During the 1920's when he was living in the State of Washington, Sanders had purchased the ranch which was transferred to petitioner upon its organization. The ranch was operated by Sanders' brothers, primarily by Daunt Sanders (hereinafter referred to as Daunt). Sanders at the time of purchase of the ranch and thereafter until his death in 1961, was actively engaged in the newspaper business as an editor and publisher. He also owned a substantial amount of real estate. Sanders from sometime in the early 1930's made his home in California. He maintained an office in his home from which he managed his various business interests. Ewes in a breeding herd are bred in the fall. The lambs are born in the spring and sold, except for those retained for the breeding herd, in the fall. Each fall when the lambs were sold Daunt as manager of Sanders' ranch would select certain lambs to retain for the breeding herd. In the 1930's Sanders' breeding herd was stablized at between 4,000 and 5,000 sheep. This size for the herd *123 was determined by the amount of land available at the ranch. The breeding herd, each fall, consisted of mature ewes and lambs newly added to the herd. The newly-added lambs were retained to replace old ewes which were culled from the herd that year and any ewes which might be lost through death or accident. The breeding herd remained at the ranch from November until spring. When the mature ewes were bred in November the lambs retained to add to the herd were not bred but would be bred for the first time the following November. The sheep were shorn in the spring and the entire herd, including the new-born lambs, generally numbering approximately 7,000, would be driven to mountain pasture for the summer, where the herd remained until September. In late September the herd would be driven to the stockyards, pasturing along the way. After the sheep were penned at the stockyard, the separation of the breeding herd would occur. The newly-added, 6-month-old ewes which were not bred the first year were shorn the following spring with the entire herd. Sanders prepared his own tax returns until 1954, when he had an accountant prepare the return from final figures which he gave to the accountant. *124 The accountant did not assist Sanders in the gathering or classification of the material from which the final figures were obtained and usually did not see supporting schedules which, he assumed, Sanders would attach to the return in explanation of income or deduction figures shown on the return. Sanders consistently prepared a schedule reflecting sheep ranch operations, which he attached to the return to explain the "business" or "farm" income figure shown on the return. The general format of these schedules was the same over the years although certain of the captions and notations varied. The return filed for 1946 showed a net profit of $23,518.84 on Schedule C (Profit or (Loss) From Business or Profession). This profit was designated as from the ranch, and reference was made to an attached annual statement. The "annual statement" for that year was as follows, and is typical as to form of those filed in other years: Annual Statement * * * Sheep Ranch 1946
Receipts:
Lambs sold [3840 head] *
$59,587.40 [$15.51]
Wool crop
12,123.35
Rental on land
600.00
Pelts sold
70.00
Tax Refund
12.32
Total
$72,393.07
Operating Expenses: Labor
$29,369.80
Supplies
4,495.53
Pasture
4,730.98
Peas
2,088.85
Hay
1,961.49
Oats & barley
650.00
Roadwork
276.25
DDT Treatment
191.20
Real estate taxes
799.42
Ram rental
250.00
Sharing
1,128.10
Wool Growers dues
54.00
N.P. Ry. grazing
114.00
U.S. grazing
318.24
Frt. on wool
118.87
State leases
332.50
Nanum lease
1,584.00
Personal property taxes
411.00
Total Operating Expense
$48,874.23
Profit from operations
$23,518.84
Other Disbursement: Purchase of
light truck
892.00
Balance on hand from receipts
22,626.84
Depreciation: None. Ewe lambs were kept to re-
place old ewes lost. No change in
herd inventory.
Financial Statement for Year 1946
Cash Wash. Natl. Bank Tacoma 1-1-46
$16,232.37
Receipts for year
72,393.07
Total
$88,625.44
Total disbursements (Op. Exp. and
Truck)
49,766.23
Balance
$38,859.21
L.S. Withdrawal of 1946 profit
23,518.84
Balance cash in bank 1-1-47
$15,340.37
[ ewe lambs added to herd 480 head]
[ewes lost estimated 484 head]
*125 The following schedule shows the total receipts from lamb sales, together with the number of lambs sold and average price (where shown), total receipts from wool sales and total operating expenses of the ranch as reported on the "Annual Statements" attached to Sanders' income tax returns for each of the years 1936 through 1958 and as shown on the corporation income tax returns for the years 1959 through 1962: Total
Receipts
No. head
Price
Operating
Year
Wool Sales
Lamb Sales
sold
per head
expenses [1]
1936
$10,993.08 [2]
$17,619.39
2,455
$25,615.30
1937
14,423.41
23,831.52
28,235.14
1938
No schedule in evidence
1939
8,599.07
32,629.49
29,580.11
1940
14,580.69
28,084.05
30,248.35
1941
12,665.63
33,025.40 [3]
34,783.29
1942
16,205.28 [4]
50,024.26
38,538.26
1943
15,138.88
29,932.66
37,234.14
1944
12,433.07
36,619.33
3,274
40,567.11
1945
13,465.54
36,278.45
2,763
[$13.13] [5]
39,232.24
1946
12,123.35
59,587.40
3,840
[$15.51]
48,874.23 [6] *127 1947
12,175.30
56,089.45
53,728.43 [7]
1948
16,230.85
63,038.00
63,348.39
1949
17,070.71
65,449.74
[3,321]
[$19.70]
64,057.72
1950
16,340.58
91,992.72
[3,903]
[$23.57]
65,291.36
1951
32,608.01
107,467.75 [8]
70,977.03
1952
19,304.43
79,390.48
[3,687]
82,435.59
1953
19,812.15
70,211.31
4,136
73,863.33
1954
19,836.54
68,743.17
74,921.98
1955
17,558.48
63,232.92
71,540.46
1956
15,748.00
49,545.43
64,390.13
1957
15,359.25
71,906.28
3,718
63,514.01
1958
11,485.70
66,845.83
53,900.59
1959
96,102.08 [9]
63,546.90
1960
92,448.00
61,568.00
1961
78,191.00
51,771.00
1962
52,732.00
40,137.00
*126 When the "Annual Statement" was prepared for tax purposes each year, the amount of receipts shown was determined from bank deposit slips and expenses were computed from bills, checking account records, and similar memoranda. Sanders kept no formal inventory record. Sanders relied on Daunt to provide him with a count of sheep when it was needed or desired. No return or schedule shows a use of an inventory in determining income, although there is a reference to "inventory," in the year 1946 and in some of the years prior thereto. No reference is made to "inventory" in any year subsequent to 1946. No return is in evidence for the tax year 1935, but a letter dated October 21, 1936 to Sanders from an internal revenue agent in Tacoma shows an upward adjustment in ranch income due to an "Inventory value increase 12/31/35," in the amount of $2,338.60. The explanation of this adjustment *128 is as follows: In re to ranch income I allways [sic] accepted your inventory values of livestock as reported in your various returns in prior years, as check make with market quotations at close of year allways [always] indicated that, taking into consideration the various ages of ewes etc., the values given by you on returns were apparently reasonable and accepted therefore as OK and, based on requirements of computation of farm income as covered in regulations, show your net profit on ranch, as amended, as follows: Receipts
$36,605.10
Add: Inventory 12/31/1935 - 4701 head at $3.60
16,923.60
53,528.70
Less: Inventory 1/1/35 - 4760 head
$14,585.00
Purchases 1935 as replacements
8,800.00
23,385.00
Gross profits
$30,143.70
* * *
Inasmuch as we are fully agreed on the increase of ranch income do not think there is any need at this time to go into the basis on which you agree on increase but would suggest that the next time you happen to be in Tacoma please call me up as I would like to discuss this matter with you for future benefit and understanding. * * *
The revenue agent's report with respect to Sanders' income tax liability for the calendar year 1935 dated November 18, 1936, and mailed to Sanders *129 by letter dated December 4, 1936, has the following statement with respect to "inventory": Inventory live stock
12/31/34 and as
used prior year's
return
$14,585.00
Replacement costs
1935
8,800.00
23,385.00
Inventory live stock
12/31/35 as estab-
lished
16,923.60
$6,461.40 The following table shows the sales of cull ewes as reported by Sanders on his tax returns for years subsequent to 1935, together with a notation showing all references on these returns to reduction of herd for other reasons and restoration of herd by saving ewe lambs as well as a reference to "inventory." All adjustments made by a revenue agent are indicated in footnotes on the schedule. Where no notation is made there either was no investigation of Sanders' return by a revenue agent or no mention was made in the agent's report with respect to ranch income. Pencilled notations on the schedules attached to the returns are indicated by italicizing and bracketing. Cull Ewes
Statement re Ewes Lost
Year
No. Sold
Price
Statement re "Inventory"
and Lambs Saved
1936
3
$ 9.90
"Inventory value of herd 12/31/35 as estab-
See inventory statement.
lished by Rev. Agent - $16,923.60. Number
on head above date 4,701. Number
on hand as of 12/31/36 4,810. Increase in
number result of ewe lambs saved. No
depreciation claimed."
["Ewes valued at $3.60 each"] [1]
1937
Not given
861.25
"* * * as of 12/31/35 4701 head
None.
"* * * as of 12/31/37 4440 head
"Depreciation in herd $939.60" [1]
1938
Schedule not in evidence [2] *131 1939
Not given
102.00
"Herd inventory end '38 4709 head [3]
"Herd inventory end '39 4699 head"
None.
1940
Not given
877.37
"Herd inventory end '40 4700 head same as
previous year. [4]
None.
1941
Not given
1,511.65
"Herd inventory 12/31/41 same as previous
year. No depreciation on herd claimed. [4]
None.
1942
Not given
1,312.05
"No depreciation taken on herd."
None.
1943
Not given
3,147.05
["Herd inventory same."]
None.
1944
446
1,838.75
"Depreciation; Herd reduced by sale old
None.
ewes by 446 at $3.60 per (price as fixed
in inventory by Rev. agent - $1,605.60."
1945
440
$2,640.00
"Depreciation: None claimed as ewe lambs
were saved to replace old ewes sold."
["Lambs saved 900."]
["Ewes lost or killed 590
head."]
["Cull ewes sold 440
head."]
1946
None
"Depreciation: None. Ewe lambs were kept
["Ewe lambs added to
to replace old ewes lost. No change in
herd 480 head."]
herd inventory."
["Ewes lost estimated,
484 head."]
1947
Not given
2,027.52
"No depreciation on herd as ewe lambs
None.
replaced cull ewes."
1948
Not given
2,437.40
None.
None.
1949
[815]
7,396.00
None.
["Lambs traded for ewes
530 head."]
["Lambs traded for ewes
550 head."]
["Old ewes lost 260
head."]
1950
[301]
2,412.25
None.
["Ewe lambs held 670
head."]
["Ewes lost [and] killed
197 head."]
1951
367
7,019.00 [5]
None.
None.
1952
Not given
3,183.75
None.
["650 ewe lambs saved."]
1953
446
3,283.72
None.
None.
1954
Not given
3,035.15
None.
None.
1955
Not given
788.90
None.
None.
1956
Not given
2,825.00
None.
None.
1957
Not given
6,214.00
None.
None.
(A casualty loss of $2,010.00 was taken for 67 ewes "lost through
death or accidents in mountains at $30.")
1958
Not given
5,408.00
None.
None.
(A casualty loss of $2,050 was taken for 82 sheep at $25 each.)
*130 The first return filed by petitioner after incorporation was for the taxable year 1959. This return was signed by Sanders' son, Leroy Sanders, Jr. (hereinafter referred to as Leroy). It was prepared by an accounting firm which had never been employed by Sanders. The balance sheet attached to the return showed total assets valued at $300,000. A schedule attached to the return showed a value assigned to the breeding herd of $150,000 as of the beginning of the year and of $147,630 as of the end of the year. The difference of $2,370 was applied as an "other allowable deduction" to reduce earnings *132 in establishing earned surplus. It was explained as "Value of breeding ewes lost in mountains." A notation on the balance sheet stated that the herd had "no tax basis." The corporate return filed for 1960 shows no herd reduction. The asset remained at a book value of $147,630 through December 31, 1960, and again bore the notation "no tax basis." The corporate returns for the taxable years 1959 and 1960, indicate no accrual of any income items nor any deferral of expense items. There is no depreciation deduction claimed and no inventory is shown on the returns. On the corporate return filed for 1961 there is a reduction in the book value of the herd from $147,630 to $89,362, as a result of a sale of 967 sheep, reported as a sale or exchange under section 1231. A gross sales price of $6,412.80 is reduced by a "cost or other basis" of $6,058.01, leaving a gain of $354.79. Earned surplus is adjusted downward by $52,213 to reflect "Excess of book value assigned at incorporation over tax basis * * *." Book value of the herd is reduced to zero on the return filed for 1962, to reflect the sale of the remainder of the herd, again reported as a sale under section 1231. The number sold in 1962 *133 is not given. A gross sales price of $24,300 is reduced by "cost or other basis" of $9,289, leaving a gain of $15,011. Earned surplus is further reduced by $80,073 to remove excess book value. Respondent determined in his notice of deficiency that petitioner had "no basis" in the sheep herd at the time of sale and, accordingly, increased the capital gain reported by petitioner from the sale of these sheep for its taxable years 1961 and 1962 in the amount of $6,058 and $9,289, respectively. Opinion It is petitioner's position that the breeding herd which it liquidated in 1961 and 1962 had a tax basis to Sanders of $13,842.40 [1] *134 which was acquired by petitioner when the assets of Sanders' ranch were transferred to it in a tax-free exchange under section 351, I.R.C. 1954. [2] Petitioner contends that it is entitled to deduct the tax basis of its transferor from its receipts from the sale of the herd to arrive at its gain on the sale for tax purposes. Petitioner states that it was in error in showing "no tax basis" in the breeding herd on its 1959 and 1960 income tax returns and that it is not barred from correcting this error in its returns for 1961 and 1962. Respondent does not contend that petitioner would be barred from using the "tax basis" of its transferor for the breeding herd merely because it showed the herd to have "no tax basis" on its 1959 and 1960 returns or that petitioner is not entitled to the "basis of Sanders in the herd, but does contend that the basis in the herd of Sanders was zero and that it was this zero basis which petitioner acquired in the tax-free exchange. Respondent also recognizes that under the provisions of section 1231, the gain realized by petitioner is capital gain from the sale of "property used in a trade or business" since section 1231(b)(3) explicitly defines "livestock, regardless of age, held * * * for draft, breeding, or dairy purposes" as property used in a trade or business for purposes of that section and that in computing its capital gain petitioner is entitled to deduct from the sales price received *135 its "basis" in the property. The precise issue between the parties is whether Sanders at the time of the transfer of the assets of the ranch to petitioner had a basis in the breeding herd in excess of zero. To determine this issue, it is necessary to consider whether the facts in this case establish, as petitioner contends they do, that Sanders reported his farm income from the ranch on an accrual basis of accounting by use of inventories, or whether he reported his income on a cash basis without the use of inventories. Although generally taxpayers, even though they report their income on a cash basis, are required to capitalize the cost of all assets used in their trade or business with a useful life in excess of one year and recover such cost by way of depreciation, there has long been in respondent's regulations an exception for farmers. A farmer who reports income on the cash basis may deduct currently in computing his yearly income the cost of raising breeding animals on his farm regardless of the useful life of such animals and capitalize for recovery through depreciation deduction only the cost of purchased breeding animals. A farmer who elects this method has a basis of zero *136 in the breeding animals he has raised since he has recovered his total cost by way of deduction in computing his annual income. This permits the deduction from ordinary income for the cost of raising breeding animals instead of a postponement of the deduction to be taken in determining a capital gain or loss when such animal is disposed of. This advantage is given by respondent's regulations to a farmer. United States v. Catto, 384 U.S. 102 (1966). However, if a farmer elects an accrual method of accounting, he must include in his inventory the cost of breeding animals raised on his farm, as well as the cost of animals raised for sale and may elect to include at cost purchased breeding animals or to capitalize such purchased animals and recover their cost through depreciation. When a farmer on such an accrual basis sells a breeding animal carried in inventory, he deducts from the sales price, the value at which the animal is carried in inventory in computing his capital gain and reduces his opening inventory of breeding animals by the inventory value of the animals sold, thus, in effect, increasing ordinary income by this amount. If a farmer elects an accrual method, several methods *137 of valuing animals raised on the farm are available to him. One of these methods is the "unitlivestock-price" method. Since petitioner claims that this was the method used by Sanders, we need not consider whether Sanders was using any other method. From the facts we have set forth in our findings, we conclude that Sanders was on a cash basis of accounting and that the inventory of purchased ewes which he had in 1935 had been completely depreciated long before 1959 when the assets of his ranch were transferred to petitioner. The inconclusive references to "inventory," "depreciation," and "market value" used in the revenue agent's correspondence with Sanders and his reports with respect to Sanders' income tax returns for years in the late 1930's and in some of Sanders' tax returns for 1947 and prior years is far from adequate to establish that Sanders' ranch income was reported on an accrual basis of accounting at any time. There is no other indication in any of the returns filed by Sanders or in the way Sanders' records of ranch income were kept that Sanders used an accrual basis of reporting income from this farming operation. There is nothing to show that any inventory records were *138 kept or that any actual count of sheep was made. It appears that the inventory of ewes referred to in the letter from the revenue agent to Sanders with respect to his 1935 income tax return may well have been in reference to purchased ewes only, which would, of course, be capitalized by a cash basis taxpayer. Even though the revenue agent's report made an "inventory" adjustment with respect to these ewes, the continued reference on Sanders' returns to "depreciation" indicates that this adjustment might well have been intended only to arrive at a proper accounting for purchased ewes because some ewes had been sold from the herd. We therefore conclude that petitioner has failed to show that Sanders ever "kept his ranch operation books" and reported his ranch income on an accrual basis of accounting or on any basis other than a cash basis. However, even if we assume without adequate proof that in 1935 Sanders' ranch income was computed on an accrual basis and by use of a "constant unit price method" of valuing inventory and that for several years thereafter this method was continued, Sanders certainly abandoned this method by 1944 when he would otherwise have been considered to have elected *139 the "unit-livestock-price method" of valuing inventory. The unit-livestock-price method of valuation requires the taxpayer to classify his animals by age and kind and to evaluate them according to a selected unit price which does not change from year to year. Section 1.471-6(e), Income Tax Regulations. Thus, inventory is evaluated as of the opening and closing of the tax year for the purpose of determining net income. All actual expenses of keeping and maintaining the herd are then currently deducted from net income. The unit-livestock-price method had its origin in T.D. 5423, 1945 C.B. 70, as further explained by Mim. 5790, 1945 C.B. 72. [3] *140 *141 *142 *143 *144 *145 T.D. 5423 amended the regulations under the 1939 Code to permit the unit-livestock-price method of inventory valuation for farmers. The method as then approved is essentially the same as the method provided for in the current regulations, section 1.471-6 (e), Income Tax Regulations.T.D. 5423, in setting forth the various procedures by which various types of taxpayers might adopt the new method, stated that "constant-price" method taxpayers would be "considered as having elected" the new method. Mim. 5790 then instructed revenue personnel to accept unit prices previously used by constant-price taxpayers. The regulations are clear that under the unit-livestock-price method the animals must be classified and that immature animals are of a different class from mature animals. If Sanders had been using any "constant-price" method prior to 1944, such "constant-price" was only as to mature ewes. Had Sanders been on an accrual "constant-price" method of reporting ranch income, then in 1944 he would have had to establish a unit-livestock-price for lambs. That this price would have been substantially in excess of the $3.60 per ewe used in valuing ewes in 1935 is apparent from the figures *146 we have set forth as to Sanders' increasing operating costs. That before 1959 all the ewes which Sanders had purchased or raised prior to 1944 would have been disposed of is also shown from the figures in evidence showing culls sold and ewes lost. It is therefore apparent that for a number of years Sanders would have had a constantly increasing closing inventory which would have reduced his deductible costs and increased his income had he been reporting on a proper unit-livestock-price method. Having obtained the advantage of the greater deduction allowed by the cash basis through the years, at least from 1944, neither Sanders nor petitioner, as his transferee, should now be permitted to obtain another advantage by changing in 1961 and 1962 to a different method of accounting for gain from sale of breeding stock. United States v. Catto, supra.See also Leo Sheep Company v. Schuster, 234 F. Supp. 761 (D. Wyo., 1964), and Visintainer v. Allan, 191 F. Supp. 425 (D. Colo., 1961), affirmed per curiam 301 F. 2d 312 (C.A. 10, 1962). There is nothing on Sanders' income tax returns for 1944 or any subsequent year to suggest the use of an inventory on a "unit-livestock-price" method. In *147 fact, "depreciation" was claimed on the breeding herd in 1944 indicating that such method was not being used. Petitioner argues that Sanders never recovered his "basis" in the ewes in inventory in 1935. From this record, it cannot be reasonably concluded that Sanders did not in fact recover this "basis" through adjustments by way of "depreciation," "casualty losses," or some offset to sales prices of these ewes in years following 1935. Except for "depreciation" claimed in 2 years on the breeding herd and casualty losses claimed as such in 2 years, there is no direct indication that Sanders recovered whatever basis he had in ewes as of December 31, 1935. However, there is nothing in the record to show whether the receipts he reported from sales of ewes, or after 1951, the capital gain on "old ewes sold," was determined by reducing actual receipt by some amount of "basis." It is clear from the record that the income reported by Sanders from his ranch operation would have varied substantially from year to year from his income as reported if proper inventory adjustments had been made. A variation of 500 to 1,000 ewes in a 4,000 to 5,000 herd is not negligible and changes in even lesser *148 amounts could substantially affect income and therefore should be shown so that income would be adjusted by such inventory changes. However, of even more consequence is the difference in "values" and in "cost of producing" ewes in 1935 as compared to 1944 when the unit-livestock-price method was first instituted. To what extent Sanders' ranch income was decreased because no proper unit-livestock-price for lambs was used and no second-year cost of bringing these lambs to maturity was adopted by Sanders would be mere speculation. However, petitioner's explanation, i.e., that the unbred lambs retained by Sanders were of the same "classification" as mature ewes merely because they were sheared in the spring following their addition to the breeding herd although they were not bred in that first year, is untenable. First, it might be noted that at December 31, of each year when the "classification" should be made, the lambs had produced no wool. Secondly, the lamb was being retained to be a part of a breeding herd and was only incidentally sheared for wool. Finally, the regulations, the Mimeograph in explanation thereof, and cases all refer to the young animals as a different "classification" *149 from the mature animals. See Leo Sheep Company v. Schuster, supra. We conclude that petitioner's basis for purposes of computing capital gain on its sale of the ewes in its breeding herd in 1961 and 1962 was zero. Decision will be entered for respondent. Footnotes
*. The italicized, bracketed notations which appear on this schedule are handwritten thereon. Such notations appear on the schedules in evidence pertaining to some of the other tax years also. The evidence does not show whether such handwritten notations were on the schedules which were actually filed as part of the tax returns. The copies of these schedules which are in evidence were those retained by Sanders in his personal files.↩
1. In every year, with one or two exceptions, Sanders' returns show a "Total Operating" expense figure and separate deduction figures for depreciation on trucks running in amounts from approximately $128 to approximately $600. As noted elsewhere, Sanders also claimed depreciation on the breeding herd in two years. The figures here shown are the totals of "Total Operating" and truck depreciation expense items, except for 1946, where the cost of the truck was deducted as an expense. "Total operating expense" does not include breeding herd depreciation in the two years it was claimed. ↩
2. Sanders also reported approximately $6,300 in wool receipts from the Wool Association for 1934 and 1935 crops. ↩
3. In addition to other small items of income which recur in each return (e.g. income from the sale of culls and pelts), there appears on the 1941 return the item of "Tail end lambs sold - $2,909.90." ↩
4. There also appears the income item, "Bal. '32 wool - $87,99." ↩
5. As elsewhere, italicized material in brackets indicates handwritten notations on schedules. ↩
6. This does not include a separate item listed as a deduction, "Other Disbursement: Purchase of light truck - $892.00." No truck depreciation was taken in 1946. 7. This includes "Total Expense - $53,505.43" and depreciation claimed in the amount of $223.00 "[on] truck (cost to be depreciated over 4 years $892.00)." ↩
8. There is listed in 1951 an income item of $35.02 as "Interest in overdue lamb payment." ↩
9. The corporate returns do not show a breakdown of income items.↩
1. Pencil changes appear on this copy, apparently noting adjustments which were subsequently made by the revenue agent. The statement originally gave an inventory figure (illegible) for the year-end 12/31/36. The year is changed in pencil to 12/31/35. The original "depreciation" of $1,295.00 is reduced in pencil by $355.40, to $939.60. A revenue agent's report dated July 30, 1938, covered tax years 1936 and 1937. No change was made concerning the inventory figures shown on the 1936 return, but the inventory shown on the 1937 return was altered, as follows: "Deduction claimed due to decrease during year in sheep inventory
$1,295.00
Inventory for January 1, 1937 which was used for end of 1936
$16,923.60
Inv. 12/31/37, 4440 head at $3.60
15,984.00
Cost of sales increased due to inventory decrease
939.60
Cost of sales overstated 1937
355.40
"(Inventory was considered to be the same at the close of 1936 as at the close of 1935.)" ↩
2. Revenue agent's report on tax return filed for 1938 states: "Income from sheep ranch was properly reported * * * Inventories were accepted as substantially correct as the sheep are counted in and out of the government range several times a year * * * The average cost of $3.60 per head was established in prior year revenue agent's report." 3. Revenue agent's report on 1939 tax return adjusted sheep ranch income only to correct error made in transferring net income from schedule to return. ↩
4. Revenue agent notified taxpayer that return was accepted as filed. ↩
5. In 1951 and after, receipts from sale of culls were no longer listed with other ordinary receipts but were recorded as "capital gain" and were added to "net profit." The definition of animals used for breeding, draft or dairy as "property used in the trade or business" under section 1231↩ became effective as of 1951.
1. On its returns petitioner claimed a basis in the breeding herd of $14,378.40 but on brief claims the lesser figure to make what it contends is a proper adjustment for "casualty losses" in 1957 and 1958 which it states were claimed in excessive amounts. 2. All references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
3. Footnote 3 begins on next page. T.D. 5423, 1945 C.B. 70, provides as to unit-livestock-price method as follows: The "unit-livestock-price method" provides for the valuation of the different classes of animals in the inventory at a standard unit price for each animal within a class. A livestock raiser electing this method of valuing his animals must adopt a reasonable classification of the animals in his inventory with respect to the age and kind included so that the unit prices assigned to the several classes will reasonably account for the normal costs incurred in producing the animals within such classes. Thus, if a cattle raiser determines that it costs approximately $15 to produce a calf, and $7.50 each year to raise the calf to maturity, his classifications and unit prices would be as follows: calves, $15; yearlings, $22.50; 2-year olds, $30; mature animals, $37.50. The classification selected by the livestock raiser, and the unit prices assigned to the several classes, are subject to approval by the Commissioner upon examination of the taxpayer's return. A taxpayer who elects to use the "unit-livestock-price method" must apply it to all livestock raised, whether for sale or for breeding, draft, or dairy purposes. Once established, the unit prices and classifications selected by the taxpayer must be consistently applied in all subsequent years in the valuation of livestock inventories. No changes in the classification of animals or unit prices will be made without the approval of the Commissioner. A livestock raiser who uses the "unit-livestock-price method" must include in his inventory at cost any livestock purchased, except that animals purchased for breeding, dairy, or draft purposes can, at the election of the livestock raiser, be included in inventory or be treated as capital assets subject to depreciation after maturity. If the animals purchased are not mature at the time of purchase, the cost should be increased at the end of each accounting year in accordance with the established unit prices, except that no increase is to be made in the year of purchase if the animal is acquired during the last six months of that year. If the records maintained permit identification of a purchased animal, the cost of such animal will be eliminated from the closing inventory in the event of its sale or loss. Otherwise, the first-in first-out method of valuing inventories must be applied. If a taxpayer using the "farm-price method" desires to adopt the "unit-livestock-price method" in valuing his inventories of livestock, permission for the change shall first be secured from the Commissioner as provided in section 29.41-2. However, a taxpayer who has filed returns on the basis of inventories at cost, or cost or market whichever is lower, may adopt the "unit-livestock-price method" for valuing his inventories of livestock for taxable years beginning after December 31, 1943, without formal application for permission, but the classifications and unit prices selected are subject to approval by the Commissioner upon examination of the taxpayer's return. A livestock raiser who has, for taxable years beginning prior to January 1, 1944, adopted a constant unit price method of valuing livestock inventories and filed returns on that basis will be considered as having elected the "unit-livestock-price method." Mim. 5790, 1945 C.B. 72, explains the unit-livestock-price method as follows: 1. The regulations, as amended by Treasury Decision 5423 * * * provide that a taxpayer who has, for taxable years beginning prior to January 1, 1944, used a constant price method of valuing livestock will be considered as having elected the "unit-livestock-price method." No application need be made to the Commissioner by such a taxpayer for permission to use the "unit-livestock-price method" for taxable years beginning after December 31, 1943. However, if the taxpayer used a constant price method in previous years for only certain classes of his animals, and inventoried other classes by some other method, he must inventory all classes on the "unit-livestock-price method" for taxable years beginning after December 31, 1943. The unit prices used in prior years will not be changed, and shall be applicable for taxable years beginning after December 31, 1943, as well as for prior years with respect to those classes of livestock inventoried in prior years on a constant unit price method. New unit prices should be selected for those classes of livestock inventoried in prior years by some other method. Such new unit prices and classifications will be used in 1944 and subsequent years only, and are subject to approval by the Commissioner on examination of the taxpayer's return. For example, suppose a taxpayer who inventoried his breeding herd on a constant price method, and who inventoried cattle for sale on the "farm-price method" had an opening inventory in 1944 as follows: Breeding herd (constant-unit price): 700 cows at $37.50
$26,250
100 2's heifers at $30
3,000
100 yearling heifers at $22.50
2,250
Cattle for sale (farm price): 300 calves at $30
9,000
200 yearling steers at $45
9,000
100 2's steers at $60
6,000,l
$55,500 For 1944 and subsequent years he will continue to use the same unit prices used in prior years for cows and heifers, unless a change is permitted by the Commissioner. He will be required to establish unit prices for calves and steers previously inventoried on the "farmprice method" and he might select the following: 2-year old steers
$30.00
Yearling steers
22.50
Calves
15.00
The new unit prices should be applied only to animals born during the year of change and subsequent years, and new differentials should be applied to the animals growing during such year and subsequent years. Thus, the closing inventories should be as follows, assuming the numbers of animals held and retained as indicated: Closing inventory (year of change) (100 cows sold, 100 3's steers sold, 200 calves retained): 700 cows at $37.50
$26,250
100 2's heifers at $30
3,000
150 yearling heifers at $37.50
5,625
200 calves at $15
3,000
150 yearling steers at $37.50
5,625
200 2's steers at $52.50
10,500
$54,000 Closing inventory (second year) (100 cows sold, 200 3's steers sold, 300 calves retained): 700 cows at $37.50
$26,250
150 2's heifers at $45
6,750
100 yearling heifers at $22.50
2,250
300 calves at $15
4,500
100 yearling steers at $22.50
2,250
150 2's steers at $45
6,750
$48,750 Closing inventory (third year) (100 cows sold, 150 3's steers sold, 250 calves retained): ↩
600 cows at $37.50
$22,500
150 cows at $52.50
7,875
100 2's heifers at $30
3,000
150 yearling heifers at $22.50
3,375
250 calves at $15
3,750
150 yearling steers at $22.50
3,375
100 2's steers at $30
3,000
$46,875