DANIEL BANDES and LILLIAN BANDES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; WALTER SHELDON and BEULAH SHELDON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bandes v. Commissioner
Docket Nos. 4580-78, 4581-78.
United States Tax Court
T.C. Memo 1982-355; 1982 Tax Ct. Memo LEXIS 390; 44 T.C.M. (CCH) 243; T.C.M. (RIA) 82355; June 23, 1982. James R. Zuckerman, for the petitioners Michael Shaff and Laurence D. Ziegler, for the respondent PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Docket
Taxable Year Ended
No.
Petitioner
December 31
Deficiency
4580-78
Daniel Bandes and
1972
$ 43,677
Lillian Bandes
1974
5,112
4581-78
Walter Sheldon and
1972
41,105
Beulah Sheldon
1974
851
*392 The issues for decision are: 1. Whether certain hogs were held by petitioners for breeding purposes within the meaning of section 1231(b)(3)(B); [1]
2. Whether amounts paid by petitioners in 1972 to purchase cattle feed are deductible in that year; and 3. Whether cattle management fees paid by petitioners in 1972 are deductible in that year. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners in docket No. 4580-78, Daniel and Lillian Bandes, resided in Clearwater, Florida, when they filed their petition in this case. They timely filed joint Federal income tax returns for 1972 and 1974 with the Internal Revenue Service Center in Chamblee, Georgia. Petitioners in docket No. 4581-78, Walter and Beulah Sheldon, resided in Lido Beach, New York, when they filed their petition in this case. They timely filed joint Federal income tax returns for 1972 and 1974 with the Internal *393 Revenue Service Center in Holtsville, New York. Petitioners in both cases used the cash method of accounting for 1972 and 1974. Petitioners Daniel Bandes and Beulah Sheldon are brother and sister. Lillian Bandes and Beulah Sheldon are parties solely by virtue of having filed joint returns with their husbands. For convenience, references to "Bandes" and "Sheldon" will be to petitioner-husbands. References to petitioners will also be to petitioner-husbands. Both Bandes and Sheldon had been interested in agriculture and food products before the transactions in this case. Petitioner Bandes was graduated from the school of agriculture at Ohio State University just before World War II. Sheldon became interested in the various aspects of the agricultural industry at an early age. Sheldon grew up in Germany and often visited a relative's farm where he developed an interest in agricultural products and animal husbandry. He worked in the animal byproducts field in Germany, China, and later in the United States when he moved here. In 1950 he left that business and joined his wife's family in their real estate business. In 1964 and 1965, Bandes and Sheldon began a tomato growing *394 business in Florida. The tomatoes were grown hydroponically. The petitioners acquired land, constructed a hydroponic plant, and began growing the tomatoes in chemical solutions. The business was discontinued in 1966 or 1967 because of high production costs. Issue 1. The Hog Breeding Operation
Petitioners' interest in animal husbandry and food products led them into the hog breeding business. In 1969, petition Sheldon met the developer of Oak Lawn Farms, Inc. of Pine Bluff, Arkansas (Oak Lawn). Petitioner Sheldon was directed to Oak Lawn by either his attorney or someone at Bankers Trust in New York. Petitioners considered the tax consequences before beginning their hog operations. Pigs are prolific and produce two litters of 11 or 12 pigs each per year. Sows are adult female pigs. Gilts are young female pigs that have not yet delivered a litter. The gestation period of a pig is three months and three weeks. When petitioners began this operation, Oak Lawn had 5,000 mixed breed hogs of which approximately 1,000 were breeding sows and no more than a dozen were boards. Sheldon visited Oak Lawn and was impressed by the way Oak Lawn bred and maintained their animals. *395 [2] All of Oak Lawn's staff were college trained in farm management. Petitioner Sheldon was so impressed by the Oak Lawn operation that he did not consider any other farms for his hog breeding venture and later tried to help Oak Lawn raise additional capital to increase production. Sheldon visited Oak Lawn at least three or four times a year, inspecting the operation and participating in management discussions. He later became an advisory member of the Oak Lawn board of directors. To begin their hog breeding operation, petitioners, on October 1, 1970, jointly purchased 90 sows for $ 27,000 from Oak Lawn. Petitioners paid $ 2,000 in cash. The $ 25,000 balance was payable in 16 monthly installments beginning January 1, 1971, with interest on the unpaid balance at 7 1/2 percent annually. This was secured by the animals and the proceeds from the sales of the animals, and petitioners *396 had no personal liability on this debt. Petitioners' animals were marked with notches on their ears, and were kept at several locations near Pine Bluff, Arkansas. Also on October 1, 1970, petitioners entered into a hog management agreement by which Oak Lawn agreed to breed, feed, maintain, and care for the animals and their offspring for a three-year period. Oak Lawn agreed to advise petitioners about the maintenance, sale of progeny, retention of progeny, and possible expansion of their herd. Oak Lawn frequently advised petitioners concerning these matters, especially the sale of progeny. The hog management agreement further provided for management charges of $ 9.50 per month for each of the 90 sows, and $ 5 per month starting at birth for the first two months of life of each of the progeny, and $ 10.50 per month thereafter. Petitioners were given the choice of prepaying the total management charges for 1971. If the elected this prepayment option, Oak Lawn guaranteed petitioners an annual live pig crop of 16 pigs from each of the 90 sows, including at least four females fit for breeding purposes. Oak Lawn was to keep for its own account any progeny in excess of 16 per year *397 per each sow. In addition, if petitioners elected to prepay the management fees, any management charges attributable to the 90 sows after December 31, 1971, would be payable only out of the proceeds of the sale of those sows. Oak Lawn also agreed that, in the event of such prepayment, management charges would not be increased above the 1971 level during the term of the agreement and that management and selling charges applicable to progeny sold after December 31, 1971, would not exceed 70 percent of their sales price. Also payment of all management charges accruing after December 31, 1971, could be deferred until the sale of the animals (both the sows and their progeny). In October 1970, petitioners paid Oak Lawn $ 2,565 for the estimated management and feed costs for the balance of 1970 and $ 56,165.20 as prepaid management and feed charges for 1971. By letter dated October 2, 1970, petitioners instructed Oak Lawn to retain "for breeding purposes" two females from each litter born to the original 90 sows. This letter also authorized Oak Lawn to sell any of petitioners' animals that they managed with the exception of the original 90, plus the two females from each litter born *398 to those animals. On October 23, 1970, petitioners jointly borrowed $ 30,000 from Simmons First National Bank of Pine Bluff, Arkansas. The loan was non-recourse and evidenced by a nonnegotiable promissory note. Payments were to be made from the sales proceeds of hogs pursuant to the management contract between petitioners and Oak Lawn. The 90 sows purchased in October 1970 had their first litters in January 1971. Boars from Oak Lawn had been used in the breeding. From these litters, Oak Lawn selected 180 females to be retained "for breeding purposes" pursuant to the letter dated October 2, 1970. The rest of the progeny were sold at two months of age to farmers who bought them to fatten on their own farms. The 180 females retained from the first litters were impregnated and these pregnant gilts were sold for $ 36,000 in February 1972, when they were 13-months old. This sale was authorized by a letter dated January 26, 1972, from petitioner Sheldon to J. M. Shults, president of Oak Lawn. The reasons stated in this letter for authorizing the sale were that the facilities at Oak Lawn were limited and that the costs of retaining the 180 gilts much longer would become excessive. *399 [3] Furthermore, petitioners expressed a desire to pay off the Simmons First National Bank loan and a desire to reduce their indebtedness to Oak Lawn. Also the market price made it a good opportunity to sell at that time. The animals had a greater market value when they were pregnant. The balance on the Simmons Bank loan before the February sale was $ 16,724.44 and the balance due Oak Lawn was $ 25,000. After the sale, petitioners' balance with Oak Lawn was $ 4,456.98 and they had paid off the Simmons First National Bank loan. The second litters were born in June 1971. From these litters, 180 females were also retained -- purportedly for breeding purposes. These 180 females were impregnated and sold (while they were pregnant) in July 1972 for $ 36,000, at the age of 13 months This sale was supposedly authorized by a letter from petitioner Sheldon to Shults dated August 1, 1972. Petitioner Sheldon testified that this letter was written to confirm an earlier conversation. The reasons authorizing this sale, as *400 stated in the letter, were the limited facilities at Oak Lawn, the high costs of retaining the pigs, and petitioners' desire to reduce their indebtedness on the purchase contract to Oak Lawn. The balance due Oak Lawn at the time of the July sale was $ 4,269.06. On November 16, 1971, petitioners jointly purchased 60 additional sows from Oak Lawn for $ 18,000. [4] Petitioners paid $ 1,200 in cash. The $ 16,800 balance was payable in 16 monthly installments beginning January 1, 1972, with interest on the unpaid balance at 7 1/2 percent. Again this indebtedness was secured by the animals and the proceeds from the sales of those animals, and petitioners had no personal liability on this debt. These 60 sows and their progeny were maintained by Oak Lawn pursuant to a three-year Hog Management Agreement, dated November 16, 1971 (the 1971 agreement). The 1970 management agreement and the 1971 agreement were identical in most respects, particularly in regard to the prepayment option which petitioners again elected. The management charges for the 60 sows, however, was $ 12 per month as compared with the $ 9.50 per month for the 90 sows. The charges for the progeny under the 1971 agreement *401 were $ 6 per month for the first two months and $ 13 per month thereafter. [5]
*402 On November 24, 1971, Sheldon sent a letter to Oak Lawn instructing them to retain "for breeding purposes" two females from each litter born to these 60 sows. This letter authorized Oak Lawn to sell any of petitioners' animals with the exception of the purchased animals and the two females from each litter. The letter was identical to the October 2, 1970 letter which petitioners had sent to Oak lawn with respect to the 90 sows purchased then. On their 1973 Federal income tax returns, petitioners Bandes and Sheldon reported the sale in May of 1973 of the 90 sows they had purchased in October 1970. They also reported three sales of "livestock held for breeding purposes," which were apparently progeny from their purchased animals. These sales are summarized as follows: Quantity
Date Born
Date Sold
Long Term Capital Gain
180
January 1972
February 1973
$ 29,880
180
April 1972
May 1973
$ 29,880
120
March 1972
May 1973
$ 21,160
We note that taxable year 1973 is not before us. In June 1974, petitioners sold the 60 sows they had purchased in 1971. Also in 1974 petitioners made three sales of pregnant females which had allegedly been retained *403 as part of petitioners' breeding herd. These animals were born to the 60 sows purchased in 1971. Each sale considered of 120 animals and occurred 13 months after their birth. The first sale occurred in February 1974 and was authorized by a letter dated December 4, 1973. Reasons stated in the letter for making this sale were the limited facilities at Oak Lawn, the costs of retaining the animals and their progeny, and favorable prices. The second sale of that year occurred in June and was authorized by a letter from Sheldon to Oak Lawn dated June 26, 1974. Reasons stated in the letter for making this sale were that petitioners had decided to restrict the size of their herd because of the reduced market price for hogs and the costs of delivering their litters. The last sale was made in November 1974 and with that sale petitioners got out of the hog business. Beginning in late 1972, petitioner Sheldon was constantly advised of the limited facilities of Oak Lawn. Oak Lawn's own breeding herd had expanded and petitioners were concerned that Oak Lawn would be more interested in its own operation than in petitioners'. The pressure from Oak Lawn because of its limited facilities *404 was allegedly one of the reasons for making all of petitoners' sales. The sales of pregnant gilts made by petitioners in 1972 and 1974, which are in issue, were as follows: Gross Sales
Quantity
Month of Birth
Month of Sale
Proceeds
180
January 1971
February 1972
$ 36,000
180
June 1971
July 1972
$ 36,000
120
January 1973
February 1974
$ 20,160
120
May 1973
June 1974
$ 20,160
120
October 1973
November 1974
$ 20,160
Petitioners claim that the sales were of livestock held for breeding purposes within the meaning of section 1231(b)(3)(B). Respondent contends that these animals were not held by petitioners for breeding purposes. There is no dispute that the 90 sows sold in May of 1973 and the 60 sows sold in June of 1974 were held for breeding purposes. OPINION The question for decision here is whether petitioners are entitled to characterize the gain from five sales of pregnant gilts as long term capital gain under the provisions of section 1231. [6] The decision turns on whether the gilts are classified as "property used in the trade or business" under section 1231(b), hereinafter referred to as "section 1231 property." *405 That in turn depends upon whether the gilts were held for breeding purposes within the meaning of section 1231(b)(3)(B). If not, then the gain would be ordinary income. *406 Section 1231(b)(3)(B) defines property used in the trade or business as including livestock held by the taxpayer for 12 months or more and held by him for breeding purposes. Thus two requirements must be satisfied before petitioners are entitled to capital gains treatment under section 1231. They must have held the animals for 12 months or more and the animals must have been held by petitioners "for breeding purposes." There is no dispute that the 150 sows which petitioners purchased were held by them for breeding purposes. At issue here is whether the two females that were retained from each litter born to those sows were so held. Petitioners have satisfied the first requirement of section 1231(b)(3)(B), since each sale was made when the young females (gilts) were 13-months old. Petitioners argue that the gilts were held "for breeding purposes" and are therefore section 1231 property. The question of whether livestock is held for breeding purposes is a question of fact. Moore v. Commissioner,31 T.C. 735, 744 (1959); *407 McDonald v. Commissioner,23 T.C. 1091, 1097 (1955); Estate of Smith v. Commissioner,23 T.C. 690, 706 (1955). Petitioners have the burden of proving that their gilts were held for breeding purposes. Welch v Helvering,290 U.S. 111 (1933); Rule 142, Tax Court Rules of Practice and Procedure. Based on all the facts and circumstances in this case, we conclude that petitioners have not sustained their burden of proof and have not established that their gilts were held for breeding purposes. In this case, none of the gilts ever delivered a litter for petitioners. They were never actually used by petitioners for breeding purposes. Section 1.1231-2(b)(1), Income Tax Regs., provides in part: (b)(1) Whether or not livestock is held by the taxpayer for draft, breeding, dairy, or sporting purposes depends upon all of the facts and circumstances in each case. The purpose for which the animal is held is ordinarily shown by the taxpayer's actual use of the animal.However, a draft, breeding, dairy, or sporting *408 purpose may be present if an animal is disposed of within a reasonable time after its intended use for such purpose is prevented or made undesirable by reason of accident, disease, drought, unfitness of the animal for such purposes, or a similar factual circumstance. * * * (Emphasis added.)
We have also stated that "actual use" is the best indication of the purpose for which an animal is held. Moore v. Commissioner, supra at 744. While actual use is not conclusive, we have held that something more than the taxpayer's mere declaration that he considers an animal to be part of his breeding herd is clearly required. Clark v. Commissioner,27 T.C. 1006, 1013 (1957). Petitioners argue that they planned to increase the size of their breeding herd beyond the 150 sows which they had purchased. The allegedly intended to accomplish this result by keeping two females from each litter born to their purchased sows, having them impregnated, and then profit by selling the progeny from their breeding herd. Yet petitioners have produced no evidence in support of *409 their self-serving declarations that they considered the gilts to be part of their breeding herd. Something more than that is required. Moore v. Commissioners, supra at 744. Petitioners did not retain in their breeding herd any of the gilts born to their initial 90 sows, yet the cost of maintaining those gilts was only $ 10.50 per animal compared to $ 13 per animal under the hog management contract for the 60 sows that were purchased later. In fact all of the gilts were sold at the age of 13 months before ever delivering any litters. Petitioners have relied on that portion of section 1.1231-2(b)(1), Income Tax Regs., which provides that a breeding purpose may be present "if an animal is disposed of within a reasonable time after its intended use for such purpose is prevented or made undersirable by reason of accident, disease, drought, unfitness of the animal for such purpose, or a similar factual circumstance." Petitioners have argued that several reasons prevented them from holding the gilts until they gave birth. The first sale of 180 *410 pregnant gilts occurred in February 1972. One of the reasons petitioners offered as justifying this sale was their purported desire to reduce their indebtedness to Oak Lawn and to Simmons First National Bank. Those debts, however, were non-recourse and petitioners were not personally liable. In any event, this is not a factual circumstance similar to accident, disease, drought, or unfitness of the animal for breeding purposes as contemplated by section 1.1231-2(b) (1), Income Tax Regs.
The authorization letters for the two 1972 sales and the first two 1974 sales also gave as a reason justifying these sales the high costs of retaining the gilts and their progeny. The costs of maintaining the gilts were limited as to petitioners by reason of the two management agreements with Oak Lawn. Any increased costs as to the gilts would be borne by Oak Lawn and not petitioners. Moreover, under the prepayment option that petitioners elected under each management contract, these costs could not be increased during the three-year term of each management contract and payment of all charges after December 31, 1971 and December 31, 1972 respectively, were deferred until *411 the animals were sold. Petitioners suggest that even though their costs were limited as to the gilts, the cost of delivering and raising their progeny was not fixed. The Court is not persuaded that that is the case. Petitioners argue that the excessive costs are a valid reason for selling the gilts before they delivered a litter. However, petitioners have not offered any evidence as to the existence or amount of these purported increased costs. We are left with only their argument in their brief that the costs of delivering and raising the progeny were so high that they were forced on five successive occasions to sell the gilts while they were pregnant. Taken together with the other facts and circumstances of this case, that argument is without factual support and wholly unconvincing. Moreover, petitioners have not persuaded us that such a reason for selling, if establishing, would be similar to those contemplated by section 1.1231-2(b)(1), Income Tax Regs.
Petitioners have further argued that limited facilities at Oak Lawn forced them to sell the gilts before any litters were delivered. Each of the four authorization letters recited limited facilities *412 as a reason that frustrated their intention to retain the gilts as part of their breeding herd. We find that petitioners' actions were inconsistent with a bona fide intention to increase the size of their breeding herd. If the limited facilities at Oak Lawn were an ongoing problem, petitioner Sheldon was aware of it in late 1971 or no later than January 1972. Petitioner's actions after that date in retaining more gilts, impregnating them, and selling them at age 13 months, do not support their stated intent to increase the size of their breeding herd. It is the course possible that a limited facilities problem could develop suddenly. Petitioners have not, however, produced any evidence concerning the alleged limited facilities at Oak Lawn. In any event, we do not believe that this problem recurred at least five times during the years in issue frustrating petitioners' intentions. [7]
*413 We believe that the pattern of events that occurred throughout the course of petitioners' hog operations demonstrates that petitioners did not intend to hold the gilts for breeding purposes but were instead attempting to convert ordinary income to capital gain through the operation of section 1231. The sequence of events remain the same throughout petitioners' venture. Each time a litter was born to the purchased sows, two females were selected for petitioners by Oak Lawn. These piglets were supposedly held for breeding purposes while the rest of the progeny were sold. The two females were retained by Oak Lawn facilities and impregnated by Oak Lawn's boars. However, these animals were always sold before they delivered a litter for petitioners. All of the sales occurred 13 months after their birth, just after the 12-month holding period required by section 1231(b)(3)(B). This sequence of events does not show an intent to retain any of the gilts for breeding purposes, and we conclude that the animals were never actually so held. Petitioners argue that in any event the sale of the last 120 pregnant gilts in November 1974 was made in termination of their hog breeding operation *414 and thus came within Example (2) of section 1.1231-2(b)(2), Income Tax Regs. That example provides in part: The taxpayer retires from the breeding . . . business and sells his entire herd, including young animals which would have been used by him for breeding purposes if he had remained in business. These young animals are considered as held for breeding . . . purposes.
We note that petitioners did not sell these gilts along with the sale of their sows. The last of the sows were sold in June 1974. These 120 gilts were retained, impregnated, and sold while pregnant and at age 13 months, as had been all of the other gilts born to those sows. We do not believe these 120 gilts would have been or were used by petitioners for breeding purposes. The example in the regulations is inapplicable to the facts of this case. We hold that none of the pregnant gilts whose sales are in issue were ever held by petitioners for breeding purposes within section 1231(b)(3)(B). We therefore conclude that section 1231 does not apply to these five sales. Issues 2 and 3. *415 The Cattle Feeding Operations: Prepaid Feed and Prepaid Management Fee
FINDINGS OF FACT During 1972, petitioner Sheldon received a distribution of $ 139,258 and petitioner Bandes a distribution of $ 144,257 from D & D Homes, Inc., a subchapter S corporation. This distribution resulted from the winding up of a real estate operation in Florida. Also in 1972, each petitioner received $ 170,781 as his share of gain from the sale of a cooperative building. Both of these items were "non-recurring" items of income. As a result of these transactions, petitioners had funds available in 1972 to go into the cattle feeding business. On November 29, 1972, petitioners Sheldon and Bandes contracted with North American Land and Cattle Company of Guymon, Oklahoma (NALCO), to act as their agent and adviser for the purchase, feeding, and sale of 600 head of cattle each, for a total of 1,200 head for both petitioners. Although NALCO administered each contract separately, Bandes and Sheldon had agreed to share the expenses and proceeds of the business equally. Each contract appointed NALCO as agent to select feedlots, negotiate and execute feeding contracts, and oversee the buying, managing, *416 and selling of the cattle. The contracts also authorized NALCO to negotiate and contract for the delivery of the 1,200 head of cattle by December 3, 1972. NALCO was to receive $ 8 per head of cattle as basic compensation for its management services. On December 12, 1972, petitioners jointly paid NALCO this management fee of $ 9,600, which represented $ 4,800 for each of them. As part of its services, NALCO on December 12, 1972, arranged for a line of credit to each petitioner for 180 days from the American National Bank of Amarillo, Texas. The maximum for each petitioner was $ 210,000 at eight percent interest. On June 25, 1973, each line of credit was renewed for an additional 180 days at nine percent interest. This credit was secured by the feed and livestock, and petitioners had no personal liability with respect to any of the advances under the line of credit. The advances from the bank were used to pay a portion of the purchase price of the cattle and feedyard charges. Except for $ 6,000 of interest paid in advance by each petition, [8] the advances from the bank and interest thereon were repaid out of the proceeds from the sales of the cattle. *417 However, no advances would have been made by the American National Bank, unless petitioners had invested in and had a net equity of at least $ 90 in each head of cattle. On December 15, 1972, each petitioner opened an account with the American National Bank of Amarillo, Texas, and deposited $ 54,000, which represented $ 90 per head for the 600 cattle to be purchased for him. On December 22, 1972, each petitioner, through NALCO, purchased 1,640,264 pounds of feed at a cost of $ 48,000 each, or a total of $ 96,000 for both petitioners. The feed was stored partly at Farmers Co-op Elevator in Hereford, Texas, with the balance at Bruegel & Sons, Dimmit, Texas. At various times during January, February, and March 1973, NALCO, as agent, purchased 1,200 head of cattle for petitioners at a total cost of $ 411,352 (or $ 205,676 for each petitioner's 600 head). The cattle were shipped to Texsun Feedyard in Hereford, Texas, where they were fed and managed. During the fattening period, 47 of the animals died. Starting in July 1973 and ending in October 1973, the surviving 1,153 animals were sold for a total sales price of $ 578,476 (or $ 289,238 for each petitioner). The feed purchased *418 by NALCO on December 22, 1972, was the only grain purchased to feed the cattle. A portion of this feed was not consumed by the cattle. The unused feed was sold for the account of petitioners during the latter part of 1972 for some $ 3,424 (or $ 1,712 for each petitioner). The price of feed in the Guymon, Oklahoma and Hereford, Texas areas varied directly with grain prices in Kansas City, Missouri, and Chicago, Illinois. The monthly cash prices per bushel of No. 2 yellow corn on the Kansas City grain market were as shown in Table I; the monthly cash prices per bushel of No. 2 yellow corn on the Chicago grain market were as shown in Table II; the weekly cash price per bushel for No. 2 yellow corn on the Chicago and Kansas City grain markets were as shown in Table III; set out below: >100> >101> TABLE I CASH PRICES FOR CORN NO. 2 YELLOW -- KANSAS CITY
(PER BUSHEL)
Year
beginning
Oct.
Oct.
Nov.
Dec.
Jan.
Feb.
Mar.
Apr.
May
1955
$ 1.32
$ 1.30
$ 1.38
$ 1.37
$ 1.41
$ 1.43
$ 1.50
$ 1.62
1956
1.38
1.41
1.39
1.34
1.32
1.33
1.33
1.39
1957
1.16
1.21
1.16
1.13
1.11
1.16
1.23
1.29
1958
1.11
1.11
1.12
1.12
1.12
1.13
1.21
1.24
1959
1.16
1.09
1.08
1.15
1.13
1.16
1.18
1.18
1960
1.06
.99
1.05
1.09
1.10
1.09
1.04
1.11
1961
1.15
1.18
1.12
1.09
1.04
1.13
1.14
1.15
1962
1.19
1.15
1.21
1.25
1.25
1.24
1.21
1.22
1963
1.19
1.22
1.24
1.25
1.24
1.27
1.29
1.31
1964
1.27
1.26
1.32
1.33
1.33
1.34
1.36
1.35
1965
1.21
1.21
1.30
1.34
1.32
1.25
1.32
1.31
1966
1.39
1.39
1.42
1.40
1.37
1.38
1.34
1.35
1967
1.20
1.17
1.19
1.22
1.22
1.24
1.22
1.25
1968
1.14
1.19
1.16
1.20
1.21
1.33
1.25
1.33
1969
1.24
1.23
1.23
1.28
1.29
1.26
1.29
1.30
1970
1.41
1.42
1.50
1.52
1.51
1.50
1.50
1.52
1971
1.15
1.16
1.27
1.27
1.26
1.28
1.30
1.32
*419 Year
beginning
Oct.
June
July
Aug.
Sept.
1955
$ 1.16
$ 1.65
$ 1.62
$ 1.48
1956
1.38
1.43
1.34
1.21
1957
1.34
1.33
1.29
1.18
1958
1.28
1.25
1.23
1.16
1959
1.19
1.22
1.19
1.11
1960
1.14
1.17
1.15
1.15
1961
1.18
1.18
1.13
1.16
1962
1.31
1.32
1.31
1.29
1963
1.29
1.26
1.28
1.33
1964
1.34
1.33
1.28
1.26
1965
1.31
1.40
1.45
1.43
1966
1.36
1.33
1.24
1.22
1967
1.23
1.21
1.14
1.13
1968
1.31
1.29
1.28
1.22
1969
1.34
1.34
1.42
1.46
1970
1.55
1.50
1.33
1.18
1971
1.31
1.31
1.28
1.35 >100> >101> TABLE II
CASH PRICES FOR CORN NO. 2 YELLOW -- CHICAGO
(PER BUSHEL)
Year
beginning
Oct.
Oct.
Nov.
Dec.
Jan.
Feb.
Mar.
Apr.
May
1965
$ 1.23
$ 1.16
$ 1.24
$ 1.32
$ 1.31
$ 1.28
$ 1.28
$ 1.31
1966
1.40
1.35
1.45
1.42
1.41
1.41
1.38
1.39
1967
1.17
1.10
1.14
1.13
1.15
1.17
1.16
1.19
1968
1.09
1.15
1.16
1.20
1.18
1.17
1.21
1.32
1969
1.21
1.18
1.19
1.26
1.26
1.24
1.28
1.32
1970
1.42
1.42
1.54
1.59
1.57
1.55
1.51
1.52
1971
1.10
1.07
1.22
1.22
1.21
1.22
1.26
1.28
Year
beginning
Oct.
June
July
Aug.
Sept.
1965
$ 1.33
$ 1.43
$ 1.49
$ 1.46
1966
1.38
1.31
1.23
1.20
1967
1.15
1.13
1.08
1.09
1968
1.31
1.29
1.30
1.24
1969
1.37
1.38
1.46
1.52
1970
1.57
1.48
1.29
1.16
1971
1.25
1.29
1.29
1.40
*420 TABLE III
CASH PRICES FOR CORN NO. 2 YELLOW
(PER BUSHEL)
Week of:
Price Per Bushel
Chicago
Kansas City
October 29, 1970
$ 1.39
$ 1.35
November 5, 1970
1.45
1.42
November 12, 1970
1.42
1.42
November 19, 1970
1.38
1.41
November 25, 1970
1.43
1.43
December 3, 1970
1.54
1.50
December 10, 1970
1.50
1.48
December 17, 1970
1.56
1.50
December 24, 1970
1.57
1.52
December 30, 1970
1.56
1.50
January 7, 1971
1.58
1.52
January 14, 1971
1.57
1.52
January 21, 1971
1.59
1.52
January 28, 1971
1.56
1.50
February 4, 1971
1.59
1.52
February 11, 1971
1.60
1.51
February 18, 1971
1.56
1.50
February 25, 1971
1.56
1.48
March 4, 1971
1.57
1.52
March 11, 1971
1.55
1.51
March 18, 1971
1.54
1.49
March 25, 1971
1.55
1.48
April 1, 1971
1.52
1.48
--
--
--
October 28, 1971
1.06
1.15
November 4, 1971
1.06
1.16
November 11, 1971
1.07
1.16
November 18, 1971
1.03
1.16
November 24, 1971
1.10
1.18
December 2, 1971
1.16
1.14
December 9, 1971
1.20
1.27
December 16, 1971
1.25
1.29
December 23, 1971
1.22
1.29
December 29, 1971
1.23
1.29
January 6, 1971
1.22
1.29
January 13, 1971
1.21
1.26
January 20, 1971
1.23
1.26
January 27, 1972
1.22
1.27
February 3, 1971
1.22
1.27
February 10, 1971
1.21
1.26
February 17, 1972
1.20
1.25
February 24, 1972
1.20
1.25
March 3, 1972
1.20
1.26
March 9, 1972
1.22
1.29
March 16, 1972
1.24
1.29
March 23, 1972
1.22
1.28
March 30, 1972
1.24
1.28
April 6, 1972
1.24
1.28
*421 Petitioners purchased the cattle feed in 1972 in order to fix the amount of one item of expense and to eliminate as much risk from their operation as possible. There were two types of risk with respect to cattle feed: price and availability. By purchasing the feed in December 1972, they fixed that cost of doing business and eliminated any risk would be unavailable. Also the cattle feed had to be available as part of the preparation of the feedlots when they took delivery of the cattle. Both petitioners filed their income tax returns for 1972 under the cash method of accounting. Therefore, each petitioner claimed deductions of $ 4,800 for the management fee paid to NALCO on December 12, 1972, and $ 48,000 for the cattle feed purchased on December 22, 1972. Respondent disallowed these deductions. OPINION Respondent's disallowance of the deductions claimed for cattle feed purchased in 1972 was based upon Rev. Rul. 79-229, 1979-2 C.B. 210. That ruling provides that a prepayment for feed is deductible only if (1) the expenditure is a payment and not merely a deposit; *422 (2) the prepayment is for a business purpose and not merely for tax avoidance; and (3) the deduction does not result in a material distortion of income. [9] Respondent has conceded that a payment and not merely a deposit was made for the cattle feed but contends that neither the second nor the third test of the ruling has been satisfied by petitioners. Our decision in Van Raden v. Commissioner,71 T.C. 1083 (1979), affd. on different ground 650 F. 2d 1046 (9th Cir. 1981), is controlling in this case. Respondent again importunes us to reconsider our decision, and we again decline to do so. *423 The taxpayers in Van Raden v. Commissioner, supra, were limited partners in a cash-basis cattle feeding operation. In December 1972, the partnership purchased a one-year supply of cattle feed and some cattle. The taxpayers deducted their distributive shares of the cost of the cattle feed on their 1972 Federal income tax returns. The deductions for the feed expense were disallowed on the grounds that there was no business purpose for the prepayment and that the deduction caused a material distortion of income. We found that there was a business purpose for the prepayment, namely, to secure a year's supply of feed at the best price. We also concluded that there was no material distortion of income. Business Purpose This Court has held in several cases that where a taxpayer prepaid the cost of cattle feed in order to assure a supply of cattle feed and fix the cost of the feed, the business purpose test is satisfied. [10]
*424 We have found as a fact that petitioners purchased the cattle feed in December 1972 to fix a portion of their costs and to protect themselves against any later increase in the price of cattle feed or any unavailability of feed. We note that the year and the geographical area involved here and in Van Raden v. Commissioner, supra, are the same. Table I and Table II of our Findings of Fact above, showing grain prices over the years, are identical to those we analyzed in van Raden v. Commissioner, supra at 1098=1099. That analysis satisfied us that there was a tendency for such grain prices to be lower in December than in January, February, or March. Thus, we concluded in Van Raden that the prepayment was for a business purpose and not for tax avoidance. We reach the same conclusion here. Distortion of Income The distortion of income test is based upon section 446(b) which provides: SEC. 446. GENERAL RULE FOR METHODS OF ACCOUTING. * * * (b) Exceptions. -- If no method of accounting has been regularly used by the taxpayers, or if *425 the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income.
Under section 446(b), respondent has broad discretion to modify a taxpayer's accounting method to insure a clear reflection of income. See United States v. Catto,384 U.S. 102 (1966); Resnik v. Commissioner,66 T.C. 74 (1976), affd. 555 F. 2d 634 (7th Cir. 1977); Cole v. Commissioner,64 T.C 1091, 1103, (1975), affd. 586 F. 2d 747 (9th Cir. 1978). Section 461 provides that deductions shall be taken by the taxpayer in the taxable year that is proper under the method of accounting used in computing taxable income. Petitioners here are cash basis taxpayers. They paid for the cattle feed in 1972 and deducted it in that year in accordance with their method of accounting. The cost of cattle feed is an allowable deduction *426 under section 1.162-12(a), Income Tax Regs., which provides that: The purchase of feed and other costs connected with raising livestock may be treated as expense deductions insofar as such costs represent actual outlay . . .
This language supports the conclusion that petitioners were entitled to deduct the feed expenses which were paid in that year. Van Raden v. Commissioner, supra.
As in Van Raden, respondent relies on section 1.461-1(a)(1), Income Tax Regs., which provides that an expenditure may not be deductible in the taxable year in which it is made, if it results in the creation of an asset having a useful life extending substantially beyond the close of the taxable year. Since the cattle feed lasted until all of the cattle were sold in October 1973, respondent argues that the cattle feed should be deducted in that year. This argument was rejected in Van Raden v. Commissioner, supra at 1107-1108, and we reject it here for the same reasons. [11]
*427 In Van Raden, we recognized that cattle feed costs are production costs, not period costs. [12] Period costs arise with respect to time intervals. They are ongoing regardless of the size of the business. They can be easily allocable to more than one accounting period to prorating the cost of the asset over its useful life. On the other hand, production costs depend upon the size of the business. Cattle feed is a product cost. Exhaustion of the cattle feed depends upon the number of cattle and their rate of consumption, not the passage of time. Van Raden v. Commissioner, supra at 1108; Frysinger v. Commissioner,645 F. 2d 523, 527-528 (5th Cir. 1981), affg. a Memorandum Opinion of this Court. Since the *428 cattle feed costs cannot be easily allocated over time, respondent would require that they be specifically accounted for. Farmers are permitted, however, to use a cash basis method of accounting and are not required to use inventories. Sec. 1.471-6(a), Income Tax Regs. As we said in Van Raden, supra at 1108: To impose upon the farmer the duty to maintain consumption records or to inventory the feed is contrary to the historical concession to farmers of not requiring inventories allowed by the Commissioner in his own regulations.
See also United States v. Catto, supra; Frysinger v. Commissioner, supra, 645 F. 2d t 526-528. We have consistently held that farmers are permitted to deduct prepaid costs under circumstances similar to those presented here. Van Raden v. Commissioner, supra; Frysinger v. Commissioner, supra.[13] We hold that the cattle feed expenditures which petitioners paid in 1972 are deductible for that year. [14]
*429 For 1972 each petitioner deducted $ 4,800 which he paid to NALCO on December 12, 1972. This $ 4,800 represented a management fee of $ 8 per head of cattle paid pursuant to petitioners' contract with NALCO. Respondent initially disallowed all of that amount, but now apparently concedes the amount is deductible, arguing only the timing of portions of the deduction. In his reply brief, respondent argues that if the deduction should be apportioned between 1972 and 1973, a fair allocation would be $ 1,200 for 1972 and $ 3,600 for 1973. Petitioners, on the other hand, argue that a proper allocation would be just the reverse, $ 3,600 in 1972, one of the years before the Court, and $ 1,200 in 1973, a year not before the Court. During 1972, NALCO arranged for a line of credit for each petitioner with the American National Bank of Amarillo, Texas, and arranged for and completed the purchase of the cattle feed, and perhaps selected the feed lots. In 1973, NALCO purchased the cattle and delivered the cattle to the feed lots. NALCO also provided monthly financial operations statements, prepared the cattle for market, and later sold the cattle on petitioners' behalf. There is no evidence *430 in the record as to the relative value of the various management services which NALCO performed. However, NALCO performed services and petitioners paid a fee for those services and clearly are entitled to deduct part of that fee in 1972. Using our best judgment, we hold that $ 2,400 is properly allocable to services performed in 1972 and can be deducted for that year. Cohan v. Commissioner,39 F. 2d 540 (2d Cir. 1930). See also De La Cruz v. Commissioner, supra.
To reflect petitioners' concession of the prepaid interest item and our foregoing holdings, Decisions will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise indicated. ↩
2. The animals were maintained under sanitary conditions. All of them were kept off the ground. Since many deaths are caused by sows rolling on piglets and crushing them, Oak Lawn kept their sows in troughs which permitted the piglets to nurse but prevented the sows' weight from crushing them. ↩
3. These costs must refer to Oak Lawn's costs, because the costs to petitioners were fixed for at least three years under the terms of the hog management contract. ↩
4. Although the animals are referred to here as "sows," this 1971 agreement like the earlier agreement of October 1, 1970, described the animals purchased as female pigs between nine months and 18 months of age. While these female pigs were represented and warranted to be fertile, there was no requirement that these animals have previously delivered a litter of pigs or have been previously impregnated. At the time of this second purchase of breeding animals, the first progeny of the original 90 breeding animals (the 180 gilts sold in February 1972) were just 11 months old and had just been bred. ↩
5. The $ 12 fee allocated $ 10 per month for feed and $ 2 per month for services and other obligations that Oak Lawn was to perform. The $ 6 fee allocated $ 5 per month for feed and $ 1 for services. The $ 13 fee allocated $ 11 per month for fee and $ 2 for services. Under the prepayment option, however, Oak Lawn guaranteed only five litters of eight pigs each for each sow, but upon prepayment for 1972 the charges beyond December 31, 1972, again would not be increased during the three-year term of the agreement. ↩
6. SEC. 1231 PROPERTY USED IN THE TRADE OR BUSINESS AND INVOLUNTARY CONVERSIONS. (a) General Rule. -- If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. For purposes of this subsection -- (1) in determining under this subsection whether gains exceed losses, the gains described therein shall be included only if and to the extent taken into account in computing gross income and the losses described therein shall be included only if and to the extent taken into account in computing taxable income, except that section 1211 shall not apply; and (2) losses (including losses not compensated for by insurance or otherwise) upon the destruction, in whole or in part, theft or seizure, or requisition or condemnation of (A) property used in the trade or business or (B) capital assets held for more than 6 months shall be considered losses from a compulsory or involuntary conversion. * * * (b) Definition of Property Used in the Trade or Business. -- For purposes of this section -- (1) General Rule. -- The term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not -- (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, (B) property held by the taxpayer primarily for the sale to customers in the ordinary course of his trade or business, or (C) a copyright, a literary, musical, or artistic composition, a letter or memorandum, or similar property, held by a taxpayer described in paragraph (3) of section 1221. * * * (3) Livestock. -- Such terms includes -- (A) Cattle and horses, regardless of age, held by the taxpayer for draft, breeding, dairy, or sporting purposes, and held by him for 24 months or more from the date of acquisition, and (B) other livestock, regardless of age, held by the taxpayer for draft, breeding, dairy, or sporting purposes, and held by him for 12 months or more from the date of acquisition. Such term does not include poultry. * * * ↩
7. We need not decided whether a condition of temporarily limited facilities can ever be a circumstances similar to accident, disease, or drought and therefore within section 1.1231-2(b)(1), Income Tax Regs.↩ Here, in addition to the five sales in 1972 and 1974, petitioners also sold all of their pregnant gilts in 1973, in each instance when the gilts were 13-months old. 8. On December 29, 1972, the American National Bank advanced each petitioner $ 30,000. In their briefs, petitioners have conceded the issue of a prepaid interest deduction with respect to this advance. Apparently the only cash that each petitioner invested in the cattle feeding transaction was an initial $ 54,000 equity in the cattle, described in the text below, and this $ 6,000 item labeled as interest. ↩
9. Rev. Rul. 79-229, 1979-2 C.B. 210, superseded Rev. Rul. 75-152, 1975-1 C.B. 144, which was discussed in Van Raden v. Commissioner,71 T.C. 1083, 1096 (1979), affd. on different grounds 650 F. 2d 1046 (9th Cir. 1981), but did not change these three tests. Most courts discussing the issue of prepaid feed deductions have applied the tests set forth in these revenue rulings. We note, however, that revenue rulings do not have the force of law and are merely a statement of the Commissioner's litigating and administrative position. See Stubbs, Overbeck & Associates v. United States,445 F. 2d 1142, 1146-1147↩ (5th Cir. 1971). 10. Van Raden v. Commissioner, supra;Frysinger v. Commissioner,T.C. Memo. 1980-89, affd. 645 F. 2d 523 (5th Cir. 1981); Heinold v. Commissioner,T.C. Memo. 1979-496; Haynes v. Commissioner,T.C. Memo. 1979-240, De La Cruz v. Commissioner,T.C. Memo. 1978-8. Respondent's Rev. Rul. 79-229, supra,↩ also provides that fixing maximum prices and securing an assured feed supply satisfy the business purpose test. 11. This argument was also rejected in Heinold v. Commissioner, supra;Haynes V. Commissioner, supra; Frysinger v. Commissioner, supra.↩
12. Thus, this Court has declined to follow the Court of claims, which held that cattle feed was a period cost. Clement v. United States, 217 Ct. C1. 495, 580 F. 2d 422 (1978), cert. denied 440 U. S. 907↩ (1979). 13. See also Heinold v. Commissioner, supra;Haynes v. Commissioner, supra;De La Cruz v. Commissioner, supra.↩
14. In view of the rationale for our holding and the fact that an appeal in these cases will not be to the Ninth Circuit Court of Appeals, we need not consider whether we agree with the one-year rule enunciated by that circuit in Zaninovich v. Commissioner,616 F. 2d 429 (9th Cir. 1980), revg. 69 T.C. 605↩ (1979).